# Illinois Official Reports

## Appellate Court

<div style="border">

### *People v. Schaffer*, 2014 IL App (1st) 113493

</div>

| | |
|---|---|
| Appellate Court Caption | PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MATTHEW SCHAFFER, Defendant-Appellant. |
| District & No. | First District, Third Division<br>Docket No. 1-11-3493 |
| Rule 23 Order filed<br>Rule 23 Order<br>withdrawn<br>Opinion filed | November 27, 2013<br><br>January 15, 2014<br>January 17, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's convictions for armed robbery, home invasion, and aggravated criminal sexual assault were reversed and the cause was remanded for a new trial, since the evidence was closely balanced, the outcome depended on the jury's resolution of the issue of credibility, and the prosecutor improperly cross-examined defendant in a manner that forced him to speculate as to the intent and credibility of the victim and other witnesses and whether they had fabricated their testimony. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 10-CR-11231; the Hon. Hyman I. Riebman, Judge, presiding. |
| Judgment | Reversed and remanded. |

Counsel on
Appeal

Ralph E. Meczyk, Darryl A. Goldberg, and Marc W. Martin, all of Chicago, for appellant.

Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, William L. Toffenetti, and Jonathan Hwang, Assistant State's Attorneys, of counsel), for the People.

Panel

JUSTICE PUCINSKI delivered the judgment of the court, with opinion.
Presiding Justice Hyman and Justice Neville concurred in the judgment and opinion.

## OPINION

¶ 1        Following a jury trial, defendant Matthew Schaffer was convicted of aggravated criminal sexual assault, home invasion, and armed robbery. The trial court imposed a 20-year term of imprisonment for aggravated criminal sexual assault, a consecutive 10-year term for home invasion, and a concurrent 10-year term for armed robbery, for a total of 30 years in prison. On appeal, defendant contends that the State improperly cross-examined him regarding other witnesses' credibility and prejudiced his right to a fair trial. Defendant further argues that other questions and comments by the prosecutor prejudiced him. For the reasons that follow, we reverse and remand for a new trial.

¶ 2        Defendant's conviction arose from the events of May 23, 2010. It is uncontested that in the early morning hours of that date, defendant and V.L. engaged in some sort of sexual activity in the condominium of V.L.'s friends in Wheeling, Illinois. The State's theory of the case was that defendant, a stranger to V.L., broke into the second-floor condominium, sexually assaulted V.L., and stole certain items from her and the home. Defendant's theory was that V.L. had purchased marijuana from him twice before, he was invited into the condominium on the date in question, their sexual activity was consensual, and V.L. gave him her watch as payment for marijuana and fabricated her allegations because she had been caught cheating on her husband.

¶ 3        At trial, V.L. testified that on the weekend in question, she traveled from New York to the Chicago area to visit her parents and her friends. On May 22, 2010, V.L., her friends Lena Polishuk and Galena Nurayan, along with Nurayan's boyfriend, went into downtown Chicago for dinner. After dinner the women went to a hotel lounge, where V.L. had a glass of wine, and then another restaurant. About 2:30 or 3 a.m., V.L. and Polishuk went back to Polishuk's condominium in Wheeling. Polishuk's husband, Igor Reynlib, was sleeping on the couch. V.L.

- 2 -

borrowed a T-shirt from Polishuk to sleep in, changed, and went to bed in the guest bedroom with the door closed.

¶ 4        V.L. testified that some time later, she heard the door to the room open. She opened her eyes and saw someone standing in the doorway. Thinking it was Reynlib and he needed something in the room, she said, "It's okay, you can come in. I'm awake." The door closed, but then opened again. A man rushed in and grabbed her throat. V.L. could feel a knife at her throat. The man, who was wearing a pantyhose mask with the eyes and mouth cut out, said he had a knife and a gun and that if she screamed he would kill her. He kept repeating the threat, so V.L. did not scream. V.L. testified that she saw the knife, which was about three inches long and possibly a folding knife.

¶ 5        The man had V.L. roll onto her stomach and handcuffed her hands behind her back. Her hands started to go numb, and V.L. complained to the man that the handcuffs were tight and hurting her hands. When the man turned on a light, she could see he was wearing rubber gloves and was pointing a gun at her. Despite the pantyhose mask, V.L. could made out pockmarks or some kind of skin irregularities on the man's face. She described him as about 5 feet 10 inches tall, 160 or 170 pounds, and stated he may have had a mustache. V.L. said that he had a very strong odor of marijuana and that he spoke a mixture of English and Spanish, which she understood because she worked in a Spanish-speaking environment. The man asked her where all the money and valuables were, but she explained that she did not know because she did not live there. When V.L. told him the owners of the condominium were in the bedroom across the hallway, the man reiterated to her that if she made a noise he would kill her.

¶ 6        V.L. testified that the man pulled off her wedding band, took her watch from the night stand, and took $100 from her purse. As he moved about the room, he made angry statements about President Obama and quoted a Martin Luther King speech. He asked V.L. what she had ever done for anyone to justify his not killing her. V.L. answered that she gave her leftovers to a homeless person and volunteered in an emergency room. The man responded that maybe she was not such a bad person. After making V.L. flip onto her back, he told her she was pretty and that he had been hurt by pretty women many times before. The man used his knife to cut off her T-shirt and underwear. He ran the knife along her body and touched her breasts and stomach. Noting that she was married, he asked V.L. whether she had children. When she told him no, he said, "[M]aybe if you live through this you'll have some." The man asked V.L. if she was menstruating. When she lied and said she was, he told her she was lucky.

¶ 7        The man pushed V.L. to her knees on the floor, with her body against the bed. He asked if there was a condom in the room. V.L. told him she did not know. The man put his penis in her anus. V.L. testified that she had never had anal sex before and "it was pain, everywhere was pain, pain in my hand, pain in my body." The man pushed V.L. onto the bed and asked her if she wanted to live, to which V.L. responded yes. He also asked if she was going to call the police. When V.L. said she would not, he told her if she stayed in the room and did not call the police or go to the hospital, then perhaps he would let her live. The man walked around the room, took the handcuffs off V.L.'s wrists, and left.

¶ 8        V.L. testified that she sat there for a little bit and then went to the front door to make sure it was locked. She then took a shower, during which she noticed blood and washed herself

- 3 -

thoroughly. After the shower, she went to Polishuk and Reynlib's room to wake them and tell them what happened. Polishuk insisted on calling the police.

¶ 9 The police arrived at the condominium around 5 a.m. At their direction, V.L. went to Glenbrook Hospital. There, she was examined by a doctor, with whom she discussed a sexual assault kit. V.L. and the doctor decided not to use the kit because she had washed very thoroughly with antibacterial soap and had several bowel movements prior to going to the hospital, both of which made it very unlikely there would be any fluid or other material to collect with swabs. V.L. did take medication for sexually transmitted diseases. After leaving the hospital, V.L. spoke with members of the Wheeling police department.

¶ 10 V.L. identified photographs of her hands, showing red marks on both her wrists. She also identified pictures of the underwear and T-shirt she had been wearing on the night in question.

¶ 11 On cross-examination, V.L. stated that at one point, a piece fell out of the gun. The man picked it up, put it back into the gun, and said, "[N]ow it's loaded, you better be careful." V.L. suspected the gun might not be real, but was not sure because she did not know anything about guns. V.L. also testified that she refused a physical examination at the emergency room because she did not want another man's finger in her anus, and because she and the doctor agreed there was no reason for the examination. She explained that she refused to see a rape counselor at the hospital because she preferred to see someone after she got home.

¶ 12 Defense counsel asked V.L. a series of questions regarding what she told the police about her assailant's physical features. The following exchange occurred:

"Q. You told the police certain things about the assailant that weren't true, isn't that right?

[ASSISTANT STATE'S ATTORNEY]: Objection.

THE COURT: Sustained.

Q. You made some things up when you talked to Officer Teichen or Conway, didn't you?

[ASSISTANT STATE'S ATTORNEY]: Objection.

THE COURT: Sustained.

[DEFENSE COUNSEL]: I don't know what the basis of the objection is, your honor.

THE COURT: The objection is sustained.

Q. You made things up, you lied to the police because you didn't want the person who had done this to you–I'm sorry, you wanted the person who had done this to you to get away, didn't you?

[ASSISTANT STATE'S ATTORNEY]: Objection.

THE COURT: The objection will be sustained."

Defense counsel asked for a sidebar, during which the prosecutor stated that the questions being asked were argumentative and meant to harass the witness. Defense counsel responded, "It's close to being argumentative but I didn't say, 'You're lying,' I didn't come out and say that. It's not because I said she lied, that is something for the jury to determine. I could ask her

- 4 -

if she did in fact not tell the truth, it's not framed in an argumentative way. It's close but not argumentative." The trial court indicated that counsel could ask V.L. what she said or did not say to the police, but could not use the word "lie" in his questioning.

¶ 13 On further cross-examination, V.L. denied knowing defendant prior to the night in question and denied ever having bought marijuana from him or anyone else.

¶ 14 Lena Polishuk testified that on the night in question, she and V.L. met Polishuk's friend, Galena Muradyan, and her boyfriend at a restaurant in downtown Chicago. Following dinner, the three women went to a rooftop lounge. After a few drinks, of which V.L. only had one, the women went to another bar, where they danced but did not drink. Around 3:30 a.m., Polishuk and V.L. went back to Polishuk's condominium in Wheeling. Polishuk's husband, Igor Reynlib, was sleeping on the couch. He woke and took the dog out briefly. V.L. borrowed a T-shirt to sleep in, and all three went to bed, V.L. in the guest bedroom, and Polishuk and Reynlib in their bedroom.

¶ 15 Polishuk testified that about 5 a.m., V.L. came into her room, frantic, shaking, crying, and wearing a towel. V.L. told her, "We have been robbed and I have been raped, there is somebody in the house." V.L. showed her marks on her wrists and said she had been handcuffed. Reynlib checked to see if anyone was still in the condominium, but did not find anyone. Against V.L.'s wishes, Polishuk called the police. The police arrived within minutes. When they asked whether anything was missing, Polishuk looked around in the guest room and noticed a diamond ring was gone. Polishuk went to the hospital with V.L., as well as the police station.

¶ 16 On cross-examination, Polishuk agreed that her dog was "very easily excitable" but did not bark on the night in question. She also acknowledged that after the incident, there was still money sitting out on the counter in the hallway and a laptop computer on the couch by the balcony door.

¶ 17 Igor Reynlib testified that on the night in question, he had been sleeping on the couch, but woke when V.L. and Polishuk came in around 3 a.m. Reynlib took the dog outside, then came back in and went to bed. Before going to bed, he checked to make sure the condominium doors were locked. He left the sliding glass door to the condominium open so as to let in the breeze, but the screen was shut and locked.

¶ 18 Reynlib testified that he woke up when V.L. came into the room he shared with Polishuk and "started saying things like we just got robbed." She also said she had been raped or assaulted. Reynlib searched the condominium to make sure no one was there and saw that the door to the balcony was unlocked. After the police arrived, he noticed his watch was missing. The police pointed out to him that a slit was cut through the screen door right by its handle, near the lock.

¶ 19 Wheeling police officer Michael Bieschke, an evidence technician, testified that he arrived at the scene a little after 6 a.m. and took photographs. He noticed that a metal vent on the outdoor wall beneath the condominium's balcony was bent, apparently from overweight capacity. Officer Bieschke was able to get onto the balcony without stepping on the metal vent by grabbing the balcony railings and lifting himself up. Another officer informed him that

there was a vertical cut in the screen door, next to the door handle. Upon examination, Officer Bieschke determined that the cut was approximately 3½ inches long. When he reached through the cut, he was able to touch the door's lock. In the bedroom, Officer Bieschke noted that the bed was unmade and that a T-shirt and a pair of women's underwear were near the foot of the bed. The underwear appeared to be torn or cut.

¶ 20     Wheeling police detective Michael Conway testified that he and another detective prepared a "critical reach flyer," which was disseminated to local police departments, describing items that were taken from the condominium: a wedding band, a diamond ring, a men's watch, and a women's watch. The flyer included the serial number of the women's watch. On May 27, 2010, the detectives received information that the women's watch had been pawned by defendant at a Chicago pawnshop for $500. Detective Conway went to the pawnshop and recovered the watch, as well as the receipts for the transaction. He learned that defendant had used his passport as identification when pawning the watch.

¶ 21     Detective Conway arrested defendant outside a store near defendant's residence and transported him to the police station in Wheeling. At the station, Detective Conway advised defendant of his *Miranda* rights. Defendant told the detective that he spoke Spanish, as he had previously lived in Arizona with his ex-wife. He said he had recently pawned his ex-wife's watch, which he had found in her jewelry box. When shown a picture of the watch at issue, he said it looked like the watch he had pawned. Detective Conway told defendant he did not believe the watch was his ex-wife's and could prove it. Defendant began to cry and said "this was going to screw up everything, and he was just getting his life back in order after his divorce." When Detective Conway stated that mistakes only get worse when people do not tell the truth, defendant said he would feel better about telling the truth if he would be given a misdemeanor rather than a felony. Defendant said that on the night in question, he was at a bar in Chicago from about 8 p.m. until 4 a.m. Subsequent to this conversation, Detective Conway executed a search warrant for a buccal swab of defendant's cheek. Defendant was thereafter released from custody.

¶ 22     On cross-examination, Detective Conway testified that on the morning of the incident, he interviewed V.L., who described her assailant as a man in his forties, 5 feet 10 inches, 170 pounds, with a pock-marked face. Detective Conway acknowledged that defendant was "nowhere near" 5 feet 10 inches or 170 pounds and did not have a pock-marked complexion. He also stated he had never seen defendant with a mustache.

¶ 23     Wheeling police detective John Connolly testified that he executed a search warrant for defendant's car. In the driver's center arm rest he found a replica handgun, designed to look like a .38-caliber gun, and a small film canister containing suspect cannabis. A glass smoking pipe with suspected cannabis residue on it was in the ashtray. In the trunk, Detective Connolly found, among other things, a plastic toy Uzi gun and a pair of black nylon pantyhose.

¶ 24     Sarah Owen, a forensic scientist with the Northeastern Illinois Regional Crime Laboratory, testified that she tested the recovered T-shirt and underwear and detected semen on both. Owen compared defendant's DNA profile with DNA profiles that had been attained from the T-shirt by another scientist. Defendant could not be excluded as the source of the nonsperm portion of the DNA on the T-shirt, and the chances of the DNA coming from a random unrelated

Caucasian were 1 in 5.29 million. Defendant's DNA profile matched the sperm portion of the DNA detected on the T-shirt. The chances of that DNA coming from a random unrelated Caucasian were 1 in 17.4 quadrillion. No comparisons were made to the sperm detected on the underwear because the sample failed to yield a sufficient amount of DNA for comparison purposes.

¶ 25    Detective Conway testified that on June 3, 2010, after a lab identified DNA recovered from the Wheeling condominium as matching defendant's DNA, he rearrested defendant.

¶ 26    Wheeling police detective Ignacio Oropeza testified that on June 3, 2010, he fingerprinted defendant and took his mug shots. According to Detective Oropeza, while in the processing room, defendant spontaneously said, "I should have killed that girl." Defendant then glanced up at the room's security camera and said, "I shouldn't have said that at a police station." Detective Oropeza explained that the security camera did not record audio, and stated that he did not know the whereabouts of the video.

¶ 27    Defendant testified that at the time of the events at issue, he was 5 feet 5 inches, weighed between 140 and 150 pounds, and did not have a pock-marked face. He was 32 years old. Defendant had been selling marijuana for at least 15 years, going back to high school, when he would deal to "other kids." Recently, he found customers mainly through friends who worked as bouncers at bars. Customers would contact him via "throw-away" phones, which he explained were prepaid phones that could not be tracked, that he was able to buy without showing identification, and that he would throw away after using up their value.

¶ 28    Defendant testified that he first met V.L. in December 2009. She had obtained one of defendant's throw-away phone numbers from a bouncer in Chicago and called him. V.L. said that she wanted to buy some marijuana, and they arranged to meet. Defendant drove to the meeting place, V.L. got into his car, and the two drove to a parking garage where they could have privacy. After they each smoked a "joint," V.L. bought an eighth of an ounce of marijuana.

¶ 29    In late February or early March 2010, V.L. called defendant on another of his throw-away phones. V.L. said she was in town on vacation and wanted to buy marijuana. The two made plans to meet. Defendant picked V.L. up in his car. She was flirty and put her hand on his leg while they talked. Defendant drove to a parking garage. After they smoked a "joint," V.L. kissed defendant and performed oral sex on him. V.L. bought half an ounce of marijuana, and the two smoked another "joint." Their conversation turned to sex. V.L. told defendant that she had "fantasies of men taking her over, taking command." She said that she fantasized about a burglar scenario where a man she did not know would take over. Defendant told V.L. that he was excited about the things she was saying and they agreed maybe they could "do something" in the future.

¶ 30    Defendant testified that he next heard from V.L. on May 22, 2010, when she again called him on a throw-away phone. V.L. said she wanted to buy marijuana and "was hoping [they] could hook up" in Wheeling in the early morning hours. Defendant, who was staying at his parents' residence in Highland Park that weekend, agreed. V.L. gave defendant the address of a condominium and indicated she would call him later. Around 2 a.m., V.L. called to say she was on her way to the condominium and that "she was hoping that we could do what we had

talked about last time." She also said she was hoping that it could be a little "kinky." Defendant gathered some childhood toys from his parents' house, including toy guns and metal handcuffs. He also had with him a small pocket knife, which he would use to clean his nails.

¶ 31    When defendant arrived at the condominium complex, he saw V.L. on a balcony, wearing a long T-shirt. V.L. told defendant to join her. When he asked why he could not come in the front door, V.L. said there were people and a dog there and she wanted to keep things quiet. After defendant got onto the balcony, he noticed that V.L. seemed intoxicated. While defendant and V.L. smoked a "joint," V.L. rubbed up against defendant's crotch, defendant rubbed V.L.'s back and rear, and they kissed. V.L. pulled defendant and said, "Let's go inside." V.L. opened the sliding door and defendant followed her inside and into a bedroom.

¶ 32    After V.L. closed the bedroom door, defendant showed her the bag of marijuana and the toys he had brought. V.L. smiled, so defendant grabbed her, kissed her, and put the handcuffs on her. V.L. said the handcuffs were tight, but she did not resist and did not tell defendant to stop. Defendant pulled out the gun and said, "I've got a gun to your head." When V.L. asked if the gun was real, defendant told her it was a toy. Defendant testified that V.L. seemed like she was "into it," so he pushed her onto the bed and ripped off her T-shirt and underwear. He noticed she was wearing a tampon. V.L. told him to take it out, but he said he did not want to. In response to his refusal, V.L. said, "Well, why don't you just put it in my ass then?" Defendant asked V.L. if she had a condom, but she did not. Because he did not want to have sex without a condom, defendant "used [his] finger instead" and rubbed against her with his penis until he ejaculated. V.L. never indicated she was in any kind of pain and never told him to stop. Defendant also denied having worn a mask or gloves and stated that he had left his pocket knife in the car. He explained that the pantyhose in his trunk belonged to a girl he was seeing.

¶ 33    Defendant testified that he took the handcuffs off V.L. They were lying on the bed when suddenly V.L. jumped up and asked defendant, "Did you hear that?" V.L. started getting shaky. She said she thought she had heard the bedroom door open and close and said she thought it was Igor. Because V.L. was acting frantic and paranoid, defendant decided to leave. He asked V.L. whether she still wanted to buy marijuana. She did, but she only had $100, and the price for the half-ounce defendant had with him was $250. V.L. gave defendant $100 and the watch off her wrist. She kept saying, "Just get out, just get out." Defendant denied taking any jewelry off V.L.'s body and denied rummaging through her purse and taking money from her wallet.

¶ 34    Defendant testified that later that day, he pawned the watch V.L. had given him. He was surprised when he received $500 for the watch. Defendant also got rid of his throw-away phone.

¶ 35    On May 27, 2010, defendant was arrested outside a store near his parents' home. The arresting officer kept calling him a "pothead." He was taken to the police station, where he was put in an interrogation room for at least three hours. Officers mainly questioned him about the watch he had pawned. He admitted pawning the watch, but lied about where he got the watch because he was concerned he was "getting busted" for drugs. Defendant denied having said, "I should have killed that girl," and "I shouldn't talk like that in a police department."

¶ 36    On cross-examination, the prosecutor established that defendant had listened to V.L.'s testimony. The prosecutor then engaged in the following examination:

"Q. [Mr. Clarke:] She said that as she slept, you charged into the room and grabbed her by the throat and held a knife to her.

A. [Defendant:] No.

Q. [Mr. Clarke:] You didn't do that?

A. [Defendant:] No, sir.

Q. [Mr. Clarke:] She made that up?

A. [Defendant:] Yes, sir.

Q. [Mr. Clarke:] Because it sounds kind of bad for you; right?

MR. MECZYK [defendant's attorney]: Objection, your honor. That's something for the jury to decide.

THE COURT: What's the objection? What's the objection?

MR. MECZYK: The objection is that's an improper question. He's commenting on what somebody–the others believe–

THE COURT: Okay. The objection–

MR. MECZYK: –the credibility of a witness–

THE COURT: The objection will be–counsel, I heard your objection. The objection will be sustained."

¶ 37    Shortly thereafter, the following cross-examination took place:

"Q. [Mr. Clarke:] You heard her testify saying that you rubbed a knife against her body or throat–

A. [Defendant:] I heard that.

Q. [Mr. Clarke:] –or breasts or stomach. Did you do that?

A. [Defendant:] No, sir.

Q. [Mr. Clarke:] You're saying she made that up?

A. [Defendant:] Yes, sir.

MR. MECZYK: Objection. Same objection.

THE COURT: Overruled."

¶ 38    After a few more exchanges, the prosecutor questioned defendant as follows:

"Q. [Mr. Clarke:] You heard [V.L.] say in this courtroom how many times over and over again you threatened to kill her. Did you hear her say that?

A. [Defendant:] Yes, I heard it.

Q. [Mr. Clarke:] Isn't that true?

A. [Defendant:] No, it's not true, sir.

Q. [Mr. Clarke:] Because, again, that sounds pretty bad for you; right?

A. [Defendant:] Yes, that sounds pretty bad.

Q. [Mr. Clarke:] So you're saying that wasn't true?

MR. MECZYK: Object–your honor, a witness can't comment about–

THE COURT: Is there an objection?

MR. MECZYK: –the believability of another witness"

¶ 39    At this point, another of defendant's attorneys, Mr. Goldberg, requested a sidebar. The trial court denied the request and asked what the objection was. Defendant's second attorney Mr. Goldberg answered that the objection was to the form of the question, and the trial court overruled the objection. The prosecutor's questioning continued:

"Q. [Mr. Clarke:] You heard [V.L.], when she testified, about you demanding money and valuables?

A. [Defendant:] Yes, I heard the testimony.

Q. [Mr. Clarke:] You're saying the only demand you made was payment for your cannabis?

A. [Defendant:] It wasn't really a demand, but–it was a request.

Q. [Mr. Clarke:] Right. You weren't going to leave there without the extra 150 she owed you; right?

A. [Defendant:] Somewhere around there. It was–yeah, that's correct.

Q. [Mr. Clarke:] So she is making that up about you demanding property; right?

A. [Defendant:] Yes.

Q. [Mr. Clarke:] As far as taking property, you heard her testify that you took her wedding band off her finger; right?

A. [Defendant:] Yes, I heard that, sir.

Q. [Mr. Clarke:] You're saying you didn't do that?

A. [Defendant:] No, sir.

Q. [Mr. Clarke:] She's making that up?

A. [Defendant:] Yes.

MR. MECZYK: Your honor, I have to object. I have to ask for a sidebar."

¶ 40    The trial court granted counsel's request. At the sidebar, defense counsel, Mr. Meczyk and Mr. Goldberg, asserted that Mr. Clarke's questions were improper because a witness cannot comment on the believability of a witness. Counsel also asserted that there was no difference between asking whether a witness is making things up and whether a witness is lying. After a short recess, the trial court ruled that it would not allow the prosecutor to use the word "lying." The court stated, "A better way to frame the question is to say, you know, [V.L.] said you did this. Did you do that? And then that takes the issue of placing–determining the credibility out of play."

¶ 41    The following questioning then took place, without objection from defense counsel:

"Q. [Mr. Clarke:] And you heard her testify about how she told you she gave her food to a homeless person and she volunteers in a hospital; right?

A. [Defendant:] Yes, sir.

Q. [Mr. Clarke:] And you're saying that discussion never took place?

A. [Defendant:] No, it did not.

Q. [Mr. Clarke:] She came up with that?

A. [Defendant:] Yes, sir.

Q. [Mr. Clarke:] Just like she came up with the Martin Luther King speeches and the Barak Obama complaints?

A. [Defendant:] Yes, sir."

¶ 42 However, defense counsel objected to the following questioning:

"Q. [Mr. Clarke:] *** [V.L.] said you asked her if she had any children. Did you ask her if she had any children?

A. [Defendant:] No.

Q. [Mr. Clarke:] So she made that up?

MR. MECZYK: Objection.

A. [Defendant:] Yes.

THE COURT: I'm sorry; was there an objection?

MR. GOLDBERG [defendant's attorney]: Yes, your honor; form of the question.

THE COURT: Objection as to the form of the question sustained."

¶ 43 Shortly thereafter, the following exchange took place:

"Q. [Mr. Clarke:] You saw the pictures and heard the testimony regarding the cut in the screen door. Do you remember that?

A. [Defendant:] Yes, sir.

Q. [Mr. Clarke:] And you maintain you didn't do that?

A. [Defendant:] Yes, sir.

Q. [Mr. Clarke:] Because that, again, sounds kind of bad for you; right?

A. [Defendant:] I'm sorry; could you ask that again?

Q. [Mr. Clarke:] Well, that would make you sound kind of guilty if you cut that screen?

MR. GOLDBERG: Objection.

MR. MECZYK: Objection to the form of the question.

THE COURT: Sustained."

¶ 44 The prosecutor then turned his attention to defendant's interaction with Detective Oropeza:

"Q. [Mr. Clarke:] The conversation with Detective Oropeza, or that statement you said you made on June 3rd of 2010 in the police station when you were being booked, do you remember that?

A. [Defendant:] No, I didn't make a statement to–

Q. [Mr. Clarke:] You did get booked by Detective Oropeza on June 3rd?

A. [Defendant:] Oh, yes, I did.

Q. [Mr. Clarke:] Right. So you never said that statement about killing that girl?

A. [Defendant:] No.

Q. [Mr. Clarke:] You never said that statement about, I shouldn't have said that in a police station?

A. [Defendant:] No. It's ridiculous.

Q. [Mr. Clarke:] Detective Oropeza came up with that on his own?

MR. GOLDBERG: Objection.

MR. MECZYK: Objection.

THE COURT: Your objection is sustained."

¶ 45 Finally, the prosecutor asked defendant about his conversation with Detective Conway:

"Q. [Mr. Clarke:] And you pleaded for a misdemeanor and not a felony?

A. [Defendant:] No, I never said that.

Q. [Mr. Clarke:] Oh, so Detective Conway is creating that himself?

A. [Defendant:] Yeah, he is.

MR. MECZYK: Objection.

THE COURT: I'll allow the answer to stand."

¶ 46 During deliberations, the jury sent out a note indicating that it was split on all three counts. With the agreement of the parties, the trial court directed the jury to continue deliberating. The jury sent out a second note, asking whether V.L. was required to testify in order for the trial to take place. The trial court answered the jury by stating that it had all the instructions as to the law that applied in the case. A few hours later, the jury sent out a third note, stating that it remained split and "there has been essentially no change since we began deliberating." Defense counsel, noting that the jury had been deliberating for over eight hours, asked the trial court to declare a hung jury. The trial court declined to do so, stating that the jury was not indicating it was deadlocked, and answered the jury that it should continue to deliberate. Thereafter, court adjourned until the next business day. Following further deliberations, the jury found defendant guilty of aggravated criminal sexual assault, home invasion, and armed robbery.

¶ 47 The trial court entered judgment on the verdict. Subsequently, the court imposed a 20-year term of imprisonment for aggravated criminal sexual assault, a consecutive 10-year term for home invasion, and a concurrent 10-year term for armed robbery, for a total of 30 years in prison.

¶ 48 On appeal, defendant contends that the State improperly cross-examined him. Defendant argues that because the case came down to a credibility contest and because the evidence was close, as evidenced by the jury's notes indicating inability to reach agreement, the State's repeated improper lines of cross-examination prejudiced him. Defendant argues that by repeatedly pursuing improper lines of cross-examination, "the State wrongly put its thumb on the scale used by the jury to assess credibility," the central issue in the case. Defendant asserts that the trial court erred in overruling some of his objections and that its rulings sustaining other objections were ineffective to cure the harm caused by the prosecutor's questions. Defendant further argues that he did not open the door to inquiries asking him to comment on other witnesses' credibility.

¶ 49    It is well established that it is improper for a prosecutor to ask a defendant his opinion on the veracity of other witnesses, as such questions intrude on the jury's function to determine witness credibility and also demean and ridicule the defendant. *People v. Young*, 347 Ill. App. 3d 909, 926 (2004) (listing cases). While the practice may be deemed harmless error when evidence of a defendant's guilt is overwhelming, reversal is warranted when the evidence is closely balanced and the credibility of the witnesses is a crucial factor underlying the jury's determination of guilt or innocence. *Young*, 347 Ill. App. 3d at 926. We review a trial court's decision whether to permit questions on cross-examination for an abuse of discretion. *People v. Turner*, 128 Ill. 2d 540, 557 (1989).

¶ 50    Here, the State improperly asked defendant whether V.L. made up that he (1) charged into the bedroom and held a knife to her; (2) rubbed a knife against her body; (3) threatened to kill her; (4) took her wedding band; (5) made comments about Martin Luther King and Barack Obama; and (6) asked whether she had children. The State also improperly asked defendant whether the cut in the screen door made him seem guilty; whether Detective Oropeza came up with defendant's statements that he "should have killed that girl" and "shouldn't have said that at a police station"; and whether Detective Conway was "creating" that defendant pleaded with him for a misdemeanor and not a felony.

¶ 51    In our view, the prosecutor's improper questions were designed to demean and ridicule defendant. This was not a case where a prosecutor was simply attempting to give a defendant an opportunity to explain differences in the evidence. See *Turner*, 128 Ill. 2d at 558 (prosecutor's questions allowed the defendant to explain his story in light of overwhelmingly conflicting evidence). Rather, the prosecutor in the instant case asked defendant questions that forced him to speculate as to other witnesses' intent and, in essence, accuse them of lying. The prosecutor did not ask defendant whether he had an explanation for differences between his version of events and V.L.'s. Here, the prosecutor baldly asked defendant whether V.L., Detective Oropeza, and Detective Conway fabricated their testimony.

¶ 52    The evidence in this case was closely balanced. The jurors were presented with a "he said/ she said" scenario in which they were tasked with deciding whether V.L. or defendant was more believable. Both witnesses presented some problems with credibility. For example, defendant was an admitted drug dealer and acknowledged that he lied to the police about where he got the watch he pawned. On the other hand, V.L. refused a sexual assault kit at the hospital and her physical description of her assailant was unquestionably inaccurate. The credibility of the witnesses was a crucial factor underlying the jury's determination of guilt. Accordingly, we cannot find that the prosecutor's improper questions were harmless. See *Young*, 347 Ill. App. 3d at 926. Given the closeness of the evidence and the fact that credibility was the core consideration before the jury, we find that defendant was denied a fair trial by the prosecution's repeated improper questioning.

¶ 53    We are mindful that the trial court sustained objections to four of the improper lines of questioning outlined above. However, in light of number of times the prosecutor made improper inquiries, we believe the trial court's actions were insufficient to remove the prejudice caused by the prosecutor's questions. See *People v. Harris*, 228 Ill. App. 3d 204, 208 (1992) (the trial court's attempts to cure the prejudice of an improper statement made by the

prosecutor by sustaining the defendant's objection and instructing the jury to disregard were insufficient). Moreover, the trial court's actions did not deter the prosecutor from continuing to ask defendant whether the State's witnesses were making up portions of their testimonies. Such persistence cannot be condoned.

¶ 54     The cases relied upon by the State in its brief do not dictate a different result in this case.

¶ 55     In *People v. Kokoraleis*, 132 Ill. 2d 235, 264-65 (1989), our supreme court acknowledged the rule that it is generally improper to ask a witness on cross-examination whether an adverse witness' testimony is truthful, but held that such questioning may be allowed "following testimony by a defendant on direct examination that he was coerced into repeating inculpatory statements furnished to him by the authorities." Here, unlike in *Kokoraleis*, defendant was not asserting that the police had forced him to make an untrue confession. Moreover, in *Kokoraleis*, our supreme court found that the evidence of the defendant's guilt was strong, so any error in cross-examination was not prejudicial. *Kokoraleis*, 132 Ill. 2d at 266. Here, the evidence was close. *Kokoraleis* is distinguishable.

¶ 56     In *People v. Baugh*, 358 Ill. App. 3d 718, 726 (2005), the defendant denied making certain statements to the police. On cross-examination, the prosecutor asked whether the testifying police officer was "making that up." *Baugh*, 358 Ill. App. 3d at 740. On appeal, we held that while the question was improper, the error did not merit a new trial because the questioning was not extensive and the single question was directed to the defendant's denial of statements he made in police custody. *Baugh*, 358 Ill. App. 3d at 740-41. In light of the evidence presented against the defendant, we could not say that a new trial was warranted. *Baugh*, 358 Ill. App. 3d at 740. Here, in contrast, the prosecutor repeatedly asked defendant to comment on the veracity of V.L., as well as Detective Oropeza and Detective Conway; the questions were not directed at statements defendant had made in police custody; and the evidence was closely balanced. Accordingly, *Baugh* is distinguishable.

¶ 57     Finally, in *People v. Turner*, 128 Ill. 2d 540, 555 (1989), the defendant testified that he spent the evening in question fishing at a lake and had nothing to do with the murder for which he was being tried. The defendant's version of events was contradicted by the evidence presented at trial, which included the testimony of his brother, his sister-in-law, and an acquaintance, who stated they saw the defendant in a co-defendant's car, and the testimony of two of the defendant's cellmates, who heard him explain what had happened on the night of the crime. *Turner*, 128 Ill. 2d at 556. On cross-examination, the prosecutor asked defendant if one police officer was telling the truth and asked why several other witnesses would have said certain things. *Turner*, 128 Ill. 2d at 556-57. On appeal, this court found that the prosecutor was not attempting to humiliate or embarrass the defendant, but rather, was attempting to have him explain his story in light of the overwhelmingly conflicting evidence. *Turner*, 128 Ill. 2d at 558. We determined that the evidence was not so closely balanced and the error was not of such a magnitude as to deny the defendant a fair trial. *Turner*, 128 Ill. 2d at 558. Here, unlike in *Turner*, the prosecutor did not ask defendant for an explanation of other witnesses' statements, but simply asked defendant whether other witnesses had made up or created their testimonies. Also, unlike *Turner*, the evidence in this case was close. *Turner* is distinguishable.

¶ 58    In this case, where the evidence was close and the jury's decision hinged on a credibility determination, the prosecution's improper cross-examination denied defendant a fair trial. Accordingly, we reverse and remand for a new trial. Given our determination that a new trial is necessary on this ground, we need not address defendant's other contentions of prosecutorial impropriety, including that the prosecutor commented on his exercise of constitutional rights, attempted to shift the burden of proof, made improper editorial comments, injected other crimes into the case, and improperly characterized him during closing argument.

¶ 59    For the reasons explained above, we reverse the judgment of the circuit court and remanded the cause for a new trial.

¶ 60    Reversed and remanded.