2021 IL App (2d) 190601-U
No. 2-19-0601
Order filed June 28, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 18-CF-566 |
| ANDRE G. JONES, | ) ) ) | Honorable Patricia Sowinski Fix, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE JORGENSEN delivered the judgment of the court.
Presiding Justice Bridges and Justice Brennan concurred in the judgment.

**ORDER**

¶ 1    *Held*: Defendant was not denied a fair trial by the prosecutor's cross-examination of defendant and closing argument comments. Affirmed.

¶ 2    Following a jury trial, defendant, Andre G. Jones, was convicted of first-degree murder (720 ILCS 5/9-1(a)(2) (West 2018)) and sentenced to 52 years' imprisonment. The trial court denied his motion to reconsider sentence. Defendant appeals, arguing that prosecutorial misconduct, including alleged demeaning cross-examination of defendant and unsupported assertions during closing and rebuttal arguments, denied him a fair trial and warrants reversal of his conviction and a remand for a new trial. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4     On March 5, 2018, at about 12:50 a.m., the victim, Melvin Devost, was shot in the left hip and killed while riding in a white Cadillac Escalade SUV near the intersection of Green Bay Road and Martin Luther King Drive in North Chicago. Devost, riding in the rear passenger seat, had just left Frank's Lounge at 2234 Green Bay Road in North Chicago with Paul Northern (the driver and Devost's brother-in-law) and Michael Mance (Northern's nephew, who was seated in the front passenger seat).

¶ 5     The gun used to shoot Devost belonged to Zachary Story, defendant's half brother, and the shots came from Story's black Cadillac SRX (which was owned by his mother), which Story was driving at the time. Defendant rode in the front passenger seat of Story's vehicle. Also in the vehicle were defendant's siblings: Cory Jones (in the rear passenger seat) and Andrea Jones (in the rear driver's-side seat). Defendant's group had also been at Frank's Lounge that evening. Story testified that defendant shot Devost, and defendant testified that Story was the shooter.

¶ 6                                    A. Zachary Story

¶ 7     Story, who resided in Rockford, testified that, on March 4, 2018, he attended an eight-hour class for a concealed-carry permit (for a nine-millimeter Taurus, the weapon used to kill Devost) and then went to Waukegan to attend his niece's (defendant's daughter's) birthday party. Story left his weapon in the back seat of his vehicle. Cory and Andrea were at the party. Afterwards, Story went to Andrea's home with his siblings and then to Frank's (with defendant, Cory, and Andrea). They arrived at Frank's at about 11:20 p.m. and parked behind the lounge. Story had never been to Frank's before, and he ended up sitting at a table in the rear by the bathrooms. At one point, Devost, whom Story did not know, gestured toward Story as Devost exited the

bathroom. The encounter lasted no more than three minutes. Story stood and did not say "a lot." Devost was confused and appeared to be intoxicated.

¶ 8    Devost approached Story's group while they were on the dance floor and made a gesture with his watch, waving it. Defendant asked Story what was wrong with the man, and Story replied that he "look[ed] drunk."

¶ 9    At about 12:20 a.m., the lights came on, indicating last call. There was "a small altercation," with Devost arguing with Cory. Story denied being involved in the argument and testified that the altercation was merely verbal, with defendant and Cory on one side and Devost and others on the other side. This occurred by the front door and lasted a couple of minutes. The exiting crowd pushed defendant and Cory out the door, and Story and his group smoked cigarettes outside for two to three minutes.

¶ 10    At one point, defendant told Story to get his gun. Initially, Story replied "Hell, no." Defendant asked again, and Story and Andrea, who was "very intoxicated," retrieved Story's gun. Andrea stayed in Story's car while Story walked back with the gun in his pocket. Defendant walked toward him, meeting him halfway, at which point Story handed defendant the gun, and defendant put it in his right coat pocket. They both walked to the front of the building, where they stayed for another 5 to 10 minutes.

¶ 11    Story and his group moved for a couple of minutes to T & T's restaurant next to Frank's. At one point, Devost tried to take a cigarette out of Story's mouth while they were in front of the restaurant, but Story stepped back. Defendant stood next to him and had the gun on him. Some people ushered Devost out of the area.

¶ 12    Andrea pulled around with Story's vehicle and got into the rear passenger seat. Story sat in the driver's seat, defendant sat in the front passenger seat, and Cory sat in the rear driver's seat.

The vehicle remained in the parking lot for a minute, and, per defendant's instruction, Story drove out of the Frank's lot, returned, and pulled up behind the Escalade. When the Escalade pulled out of Frank's lot, defendant told Story, who was unfamiliar with the area, to follow the Escalade. Story complied.

¶ 13    According to Story, while driving on Green Bay Road, defendant told him to "stop, stop, stop, then I slowed a bit." When they reached the light at Martin Luther King Drive, Story pulled up along the driver's side of the Escalade, at which point "the [front passenger] window proceeded to roll down and [defendant] fired a shot out of the window." Story looked right and said, "What the fuck?" When he looked right, he saw defendant holding the gun sideways outside the window, which was open, and firing at the Escalade. Seven or eight shots fired rapidly. After he fired the gun, defendant placed the weapon on his lap. Story then sped off, turning left onto Martin Luther King Drive. The Escalade turned right. After Story turned away, defendant instructed him on how to get back to Andrea's house. According to Story, defendant stated as to the shooting that "he [*i.e.*, Devost] had it coming."

¶ 14    Story did not know the shooting was going to happen. After he drove to Andrea's house, she drove him back to his car. "I was freaking out. My brother was freaking out." After defendant wiped it down and put bullets back in it, Story took his gun and returned home to his mother's home in Rockford.

¶ 15    The next day, defendant called Story, telling him to get rid of the gun " 'cause buddy was smoked.' " He retrieved his gun, scratched off the serial number, put it back in his book bag, and threw it in the attic of his garage.

¶ 16    The following day, Story received a call from the Lake County Sheriff's Department, asking to speak to him. He spoke to defendant, who instructed Story not to say anything other

than to tell police that he was there, people got into it, and they left. At the sheriff's department, Story initially, for about one hour, denied that anything happened. Eventually, he "broke down and told everything." No deals were made. He was charged with obstructing justice, a Class 4 felony, which has been dismissed.

¶ 17 Story hid the gun in his garage because he was scared. Defendant had told him to scratch off the serial number and "drainage ditch it." Eventually, Story told police where he hid the gun.

¶ 18 At some point before he spoke to police, pursuant to defendant's instructions, Story called his mother and instructed her to have her vehicle cleaned, inside and out.

¶ 19 On cross-examination, Story testified that, during his interview with police, he was told that someone had admitted to the shooting. It was after being told this that Story began telling police his story. When asked why he retrieved the gun for defendant, Story replied, "I don't know" and that "[he] was scared."

¶ 20 On re-direct, Story testified that his case was dismissed in bond court. On re-cross, Story testified that he was in court testifying because the State dropped felony charges against him.

¶ 21 B. Police Testimony and BP Surveillance Video

¶ 22 North Chicago police officer James Ramirez testified that, after the shooting, he canvassed the area at Green Bay Road and Martin Luther King Drive. Ramirez found three shell casings in the roadway, along with broken glass. Two of the casings were in the westbound turn lane going north and one of them was in the inside northbound lane (*i.e.*, the lane next to the westbound turn lane).

¶ 23 Lake Forest police officer Charles Flesch testified that he was assigned to the Lake County Major Crimes Task Force as an evidence technician. He processed the Escalade. Two projectiles

were located in the third-row passenger side of the SUV, and another was located in the rear lift gate.

¶ 24    Another officer, per stipulation, recovered a fired, slightly dented 9-millimeter shell casing on Green Bay Road near the same area that other officer found three shell casings.

¶ 25    Finally, a BP gas station surveillance video admitted into evidence showed that Story's vehicle and the Escalade were next to each other as they approached the intersection of Green Bay Road and Martin Luther King Drive.  Sparks appeared from the passenger side of Story's vehicle before the vehicles turned in opposite directions onto Martin Luther King Drive.

¶ 26                                      C. Michael Mance

¶ 27    Michael Mance stated that he did not want to testify in this case, but was subpoenaed to do so.  He went the Frank's lounge with Devost and his uncle, Paul Northern.  When Devost's group left Frank's lounge, Mance rode in the front passenger seat.

¶ 28    When Mance heard the shots, he bent down his head.  Prior to hearing the shots, he did not see any vehicles pull up to the white Escalade.  However, he conceded that, when interviewed by police, he stated that, when Story's vehicle pulled up to the Escalade, Mance did not see a face, but did see someone stick out their arm out of the passenger side window and shoot.  (Portions of the interview were played for the jury and admitted as substantive evidence.)  At trial, he testified that he did not see an arm sticking out the window, but only saw sparks and heard the popping of a gun being fired.  Thereafter, he ducked.

¶ 29                                      D. Paul Northern

¶ 30    Paul Northern testified that Devost was his brother-in-law.  When his group arrived at Frank's, Northern shot pool.  He saw Devost throughout the night, but did not notice any problems, arguments, or fights, other than one small altercation, which he defused.

¶ 31    When Northern left Frank's, he walked with Mance to his white Escalade. He opened the door and noticed Devost in an altercation at the restaurant next to Frank's. He walked over to retrieve Devost. "Some guy was holding [Devost] with his arms around him." Northern told the man to let him go and that he knew Devost. Northern took Devost back to his Escalade and left. Northern testified that he did not know with whom Devost was arguing. There were a lot of people there.

¶ 32    As they headed north on Green Bay Road, Northern argued with Devost, asking what had happened. Devost sat in the rear passenger seat. Northern heard two shots. At King Drive, he stopped at the light, waiting to make a right turn, and his back window got shot out. Northern then heard more shots, and he "took off," turning onto Martin Luther King Drive. Devost was silent and his head was pulled back toward the ceiling and his eyes were closed. Northern also noticed blood on Devost's left hip.

¶ 33                          E. Gary Lind

¶ 34    Gary Lind, a forensic scientist in the tool marks section of the Illinois Regional Crime Laboratory, testified as an expert in his area. He examined three shell 9-millimeter cartridge casings and testified that they were fired from a 9-millimeter Taurus semi-automatic pistol. The ejector port of the Taurus was on the top right of the gun and, therefore, the cartridge casings should eject up and to the right of the firearm.

¶ 35                          F. Dr. Mark Witeck

¶ 36    Dr. Mark Witeck, a forensic pathologist, conducted the autopsy on Devost's body. He testified that a rod inserted into Devost's pelvis showed the trajectory of the bullet that entered his body. The rod went through his hip, abdomen, and lodged on the right side of Devost's pelvis.

¶ 37                G. Officer Kirk Helgesen – Trajectory Testimony

¶ 38    Gurnee officer Kirk Helgesen, an evidence technician and a member of the Lake County Major Crimes Task Force, testified that he processed the Escalade after Devost was killed.

¶ 39    Defense counsel objected to Helgesen's testimony, arguing that his testimony was beyond the ken of the average juror and that he should have been disclosed as an expert and required to testify as such.  The State agreed that Helgesen could not testify as an expert as to an ultimate conclusion.  The court ruled that he would be precluded from offering expert testimony or opinion, but that he could testify as a lay witness about his use of a trajectory kit.

¶ 40    Officer Helgesen testified that the driver's side of the Escalade had a flat tire and about five bullet holes on the driver's side.  One bullet hole was immediately below the driver's side rear passenger door handle, and there were two bullet holes in the driver's side rear quarter panel below the window next to the gas cap.  Another hole was present by the back window over the cargo area; it traveled through the weather stripping into the glass.  A final bullet hole was in the glass, which was shattered.  Helgesen explained that, after he photographed the vehicle, he used a trajectory kit to determine potential bullet pathways.  The kit consisted of a series of metal rods that could be connected to form a longer rod.  Each rod could be placed between two points and a laser could be connected to the end of the rod.  This gave the general proximity of the path of the two points.  The kit also contained an angle finder, a protractor, and tape measures.  Officer Helgesen was trained in the kit's use.

¶ 41    Helgesen explained that he placed a rod in each bullet hole and tracked the pathway to an additional hole, after which he used a laser unit attached to the rod to project its path.  He also used a protractor to determine the general angle at which the rod entered the hole.  The angle for the bullet that entered the rear door was 90 degrees.  Two bullets entered the driver's-side rear quarter

panel at angles of 125 and 145 degrees (directly above the tire), and a final bullet entered through the weather stripping on the rear window.

¶ 42    Officer Helgesen also used a tape measure to determine the height of the holes on the Escalade. He used a laser directed out of the first hole on the rear passenger door to try to determine the height at distances of 12 and 14 feet away from the vehicle. He explained that he used those distances, because a traffic lane is generally 12 feet wide. From 12 feet away, Helgesen measured the projected height at 3 feet, 2 inches. At 14 feet away, it measured 3 feet, 8 inches. Helgesen used the same tape measure to measure the height of the passenger door of Story's vehicle. He marked the two heights on People's exhibit No. 78, a photograph of Story's vehicle, which depicted the measuring tape next to the passenger side door. The marks are just above and just below the door handle.

¶ 43    Office Helgesen agreed on cross-examination that there is a margin of error in his projections and measurements.

¶ 44                                  H. Defendant

¶ 45    Defendant testified that, on December 21, 2007, he was convicted of attempt aggravated battery with a firearm.

¶ 46    Defendant and his group arrived at Frank's between 11 and 11:30 p.m. He did not know Devost. After Devost got in Story's face, defendant asked him what that was about.

¶ 47    When asked if he ever came into contact with Devost, defendant replied that, when Devost backed away from the bar, they may have touched knees or bumped into each other. They exchanged no words. Later, as defendant's group was leaving the bar, defendant told another woman to relax and stop pushing people to get out the door. Devost was behind the woman. Defendant and Devost did not speak to each other. Other people in defendant's group were

speaking with Devost at this time, but defendant could not hear the conversation. There was no physical contact between anyone.

¶ 48    Once outside, defendant's group congregated in the parking lot. Defendant lit a cigarette as the group migrated to the front of the restaurant next to Frank's. Defendant testified that he did not see Devost come outside and was not looking for him. Defendant was on his phone during this time. Later, he saw Devost in the area, but he was never within 5 or 10 feet of defendant. At one point, Devost was close to defendant. Defendant testified that they did not touch each other or say anything to each other.

¶ 49    Defendant denied having a gun that evening and denied asking Story for a gun. Defendant testified that he was unaware there was a gun in Story's vehicle when he entered the vehicle to leave Frank's, and he denied involvement in the shooting. Other than perhaps bumping into each other in the bar, defendant had no contact with Devost and did not exchange any words with him. Devost did not "cuss" at defendant.

¶ 50    Once they were ready to leave Frank's, defendant and his group got into Story's car. Defendant sat in the front passenger seat, and Cory sat behind him. Story was in the driver's seat, and Andrea sat behind him. There was a bottle of Patrón tequila in the vehicle that the group had drunk on the way to Frank's. Defendant had set his plastic cup on the back floor, because it still contained liquor. As they left Frank's, defendant did not direct Story where to go. According to defendant, they had planned to go back to Andrea's house and he believed that Story was going to turn left to follow his cousin who rode in another car.

¶ 51    Initially, Story made a wrong turn (turning right) out of the Frank's lot, so he circled back again through the lot. Defendant retrieved his cup, which had spilled over, and the bottle from behind the driver's seat. As Story's vehicle turned left onto Green Bay Road, defendant poured

drinks for himself and Cory. He denied instructing Story to turn left. Defendant set down the bottle, turned at the waist, and reached back to give Cory his cup. Andrea asked for more liquor, and defendant, turned back, and told her she had had enough. At that point, defendant heard gunshots and Cory grabbed him and pulled him down toward the back seat. When defendant turned back forward, he saw smoke in the air from the gunfire (which he described as "foggy" and noted that no one was smoking, so it had to be "gun smoke"). He noticed Story putting his right hand back on the steering wheel, and he saw a gun on Story's lap. (This was the same gun later recovered from Story's garage and introduced at trial.)

¶ 52    Defendant denied shooting Devost, but he testified that he knows who did shoot him. Defendant denied lowering the passenger-side window at any point before the car turned onto Green Bay Road.

¶ 53    On cross-examination, the prosecutor first asked defendant, "This is your [H]ail [M]ary, isn't it?" The trial court sustained defense counsel's objection. Later, the prosecutor asked, "Well, you had to come in here and blame somebody, didn't you?", to which no objection was raised, and, "It would be a complete waste of time, give you a trial and you come in and confess to the crime?", to which the trial court overruled defense counsel's objection.

¶ 54    The prosecutor also stated, "You disregarded [Story's] testimony." Further, "And even disregarding [Story], you know that even without [Story's] testimony, all the evidence points to the front seat passenger, doesn't it?" The trial court overruled defense counsel's objection to this question. Later, the prosecutor asked, "And you observed that the only place that gunshot could have come from is the front passenger seat, didn't you?", and "So in testifying today, you have to make your testimony consistent with everything else that came in from the State, is that correct?", objections to both of which the trial court overruled.

¶ 55    The prosecutor continued:

> "Q      So, it would serve you no purpose to testify in direct contradiction to that evidence, would it?
>
> A      I don't understand.
>
> Can you—
>
> Q      Well, you had to come in here today and blame somebody, didn't you?
>
> A      No, I did not.
>
> Q      Well, you're not going to come in say that you did?
>
> A      'Cause I didn't.
>
> Q      It would be a complete waste of time, give you a trial and you come in and confess to the crime?"

¶ 56    At this point, defense counsel objected on the basis that the questioning was argumentative, and the trial court overruled the objection, instructing defendant, "You can answer that." The questioning continued:

> "Q      You came in here knowing that you had to blame somebody for the shots that killed Melvin Devost, didn't you?
>
> A      No.
>
> Q      Michael Mance, no motive, interest or bias.
>
> He came and testified that he saw the gun come out—the arm come out of the passenger side window while holding his hand in the shape of a gun, didn't he?
>
> A      No, he did not."

The trial court overruled defense counsel's objection to the compound question.

> "THE WITNESS:  No, he did not.

[Prosecutor]: I'll get get [*sic*] back to that.

\*\*\*

Q So your testimony has changed due in part to what you heard this week, isn't that correct?"

The trial court sustained defense counsel's objection.

¶ 57 Defendant admitted that he drank a lot of alcohol on the night of the shooting, but testified that he had a good recall of the events. He spoke to police on March 7, 2018, but lied to them. He stated the whole day was a blur, because he had been drinking all day. He did not tell police that Story was the shooter, because he was his brother. "I didn't know he was going up here and put everything on me."

¶ 58                    I. Closing Arguments

¶ 59 During closing arguments, the prosecutor noted that the jury should use its common sense and argued that the trajectory of the bullet through the rear passenger door would have had it travel through Devost's hip:

"So why, ladies and gentlemen, is this information so critical? Because it tells us what happened.

90 degrees. Use the laser.

Cars are pulled up next to each other.

[Story] is continuing to move forward faster and the angle is increasing as the car moves forward.

\*\*\*

\*\*\* The only bullet that goes straight through at 90 degrees is the one through [Devost's] hip.

\*\*\*

Again, there is no damage on [Story's] car, the window line, to the weather stripping. It's because he didn't shoot, ladies and gentlemen.

It is *implausible* for the driver of that car to make these angles from where he's seated and from driving.

It's *implausible* because there is a headrest. There is a window in the back seat and there are three other people in his car and his siblings."

¶ 60    On rebuttal, the prosecutor stated:

"If the shot had gone at 90 degrees at [bullet holes] 4, 5, 2 or 3[1], anywhere else, you would have seen internal bullet damage either to the window or to the quarter panel.

So now, the Defense wants you to believe that somehow these bullets magically made the turn and went into [*sic*] at 125 degrees at [bullet hole] 2 or at 3. *Impossible*.

And, also, what's also important, the increase in the angle, 90 degrees to 125 degrees, 144, shows that there is an acceleration on the vehicle.

Paul Northern's vehicle has velocity. This velocity has acceleration.

What does that mean? It means we are moving up at a faster speed.

So, now, Paul, he can't get the shot. There is no way that I can make this shot unless he's shooting like this, which is *impossible*.

\*\*\*

But, instead, we are driving, as Michael Mance first told you, first shot, we are moving forward.

---

[1] The first bullet hole struck Devost's left hip.

The Defendant is saying stop, stop, stop, and then bullet hole 2, 125 degrees, bullet hole 3, 144 degrees, bullet hole 4 and 5, whatever direction that is, you're going to see from the evidence that that's what happened (indicating).

That's the logical thing that happened.

Defendant's Counsel: thank you.

Defense counsel even stated: We admit all the bullets went out of our window.

It's physically *impossible* for Zachary Story to have been the shooter if all the bullets went out of the passenger window in that vehicle." (Emphases added.)

¶ 61             J. Verdict and Subsequent Proceedings

¶ 62    The jury found defendant guilty of first-degree murder. On April 12, 2019, defendant moved for judgment notwithstanding the verdict or for a new trial, challenging, among other things, the admission of the trajectory evidence. The trial court denied the motion, and sentenced defendant to 52 years' imprisonment. On July 9, 2019, the trial court denied defendant's motion to reconsider sentence. Defendant appeals.

¶ 63                      II. ANALYSIS

¶ 64    Defendant argues that he was denied a fair trial and that his conviction should be reversed and the case remanded for a new trial, where the State's (1) cross-examination of defendant consisted of many inappropriate questions meant only to badger defendant and not obtain meaningful testimony; and (2) closing remarks were full of expert conclusions about trajectory that were not supported by expert testimony. Defendant maintains that this case came down to a credibility determination—either Story or defendant shot Devost and blamed each other. It was undisputed that Story's gun was used and that the shots were fired from Story's SUV. The only question, according to defendant, was who fired the shots. Under such circumstances, in

defendant's view, the prosecutor's badgering of defendant during cross-examination could have been the deciding factor in the jury's decision. Also, he argues that the prosecutor's closing argument comment that it would have been impossible for Story to have fired at Devost, given the trajectory testimony, required knowledge beyond that of a lay person and was improper in the absence of expert testimony. For the following reasons, we reject defendant's arguments.

¶ 65    Preliminarily, we note that the State contends that defendant's statement of facts is generally accurate, but is argumentative and "technically" violates Illinois Supreme Court Rule 341(h)(6) (eff. Oct. 1, 2020) (requiring that the statement of facts "shall contain the facts necessary to an understanding of the case, stated accurately and fairly without argument or comment, and with appropriate reference to the pages of the record on appeal"). Specifically, the State contends that the statement of facts implies that "defendant's self-serving testimony is historical fact" and fails to even reference Lind's testimony concerning how the shell casings would have ejected from the gun and how this was relevant in determining how and where the casings were found. We agree that defendant has not complied with the requirements of the rule. However, we have reviewed the record in this case and the argumentative statements did not hamper our review of merits of this appeal. Accordingly, we decline to strike defendant's statement of facts in its entirety and we will disregard any statement of facts that contain improper argument. Counsel for defendant is admonished that any future violation of Rule 341(h)(6) will not be tolerated.

¶ 66    Turning to the merits, the United States and Illinois Constitutions guarantee the right of all criminal defendants to a fair and impartial trial. U.S. Const., amend. XIV; Ill. Const. 1970, art. I, § 2. This includes the right to a trial free from "pervasive prosecutorial misconduct that deliberately undermines the process by which we determine a defendant's guilt or innocence."

(Internal quotation marks omitted.) *People v. Wheeler*, 226 Ill. 2d 92, 122 (2007) (quoting *People v. Johnson*, 208 Ill. 2d 53, 117 (2003)).

¶ 67 The abuse-of-discretion standard applies to issues concerning the scope of cross-examination. *People v. Leak*, 398 Ill. App. 3d 798, 822 (2010). An abuse of discretion occurs when no reasonable person would take the trial court's view. *People v. Burgess*, 2015 IL App (1st) 130657, ¶ 134. There is some uncertainty as to the proper standard of review in assessing claims of prosecutorial misconduct in closing arguments, but the stronger argument favors the abuse-of-discretion standard. *People v. Phagan*, 2019 IL App (1st) 153031, ¶¶ 47-54 (noting inconsistent supreme court precedent, but utilizing abuse-of-discretion standard, as it is consistent with "over a century" of the court's precedent; further noting that the "brief chain of precedent" for the *de novo* standard was "imported *** with no explanation from cases that are either unclear or that analyze dissimilar claims"). In any event, our conclusions are the same, regardless of the standard of review.

¶ 68                                A. Cross-examination of Defendant

¶ 69 Defendant maintains that, during cross-examination, the prosecution repeatedly asked him badgering and irrelevant questions, the sole purpose of which was to demean and ridicule him and thereby undermine his credibility. The questions, he argues, were unrelated to the evidence and were instead intended to harass him. Defendant points to comments concerning: "[H]ail [M]ary," that defendant disregarded Story's testimony, he had to blame someone, whether trial would be waste of time, and that defendant's testimony had changed due to testimony from other witnesses.

¶ 70 Defendant relies on *People v. Schaffer*, 2014 IL App (1st) 113493, ¶¶ 51, 58-59, where the reviewing court reversed the defendant's convictions on the basis of prosecutorial misconduct. In *Schaffer*, the defendant was convicted of aggravated criminal sexual assault, home invasion, and

armed robbery. The State had alleged that the defendant broke into the victim's friend's condominium, sexually assaulted her, and stole items from the home. The defendant had argued that the victim had purchased drugs from him in the past, that he was invited to the home on the date in question, they engaged in consensual sex, the victim paid him for drugs with her watch, and she fabricated the allegations, because she had been caught cheating on her husband. During cross-examination of the defendant, the prosecution repeatedly asked whether the victim lied during her testimony (*e.g.*, whether she "made that up," "Isn't that true?" and "came up with that") and whether a police a detective's testimony concerning his interaction with the defendant (that the defendant stated that he should have killed the victim) was truthful. *Id.* ¶¶ 36-45. The trial court overruled some objections and sustained others.

¶ 71 The reviewing court, reviewing for an abuse of discretion, held that the prosecution's questions were improper and designed to demean and ridicule the defendant. *Id.* ¶ 51. The questioning forced the defendant to "speculate as to other witnesses' intent and in essence, accuse them of lying." *Id.* The prosecutor did not merely ask the defendant to explain the differences between his and the victim's versions of the events, but asked whether the other witnesses had "fabricated their testimony." *Id.*

¶ 72 Noting that the evidence was closely balanced, because the case presented a " 'he said she said' " scenario and the case hinged on the jury's credibility determination, the court thereby concluded that the questioning was not harmless and the defendant was denied a fair trial. *Id.* ¶ 52. Given the number of improper inquiries, the court found insufficient the fact that the trial court had sustained several objections to the improper questioning and noted that the court's actions did not deter the prosecutor. *Id.* ¶ 53. The court reversed and remanded for a new trial. *Id.* ¶¶ 58-59.

¶ 73    Here, defendant argues that credibility was the core consideration and, as in *Schaffer*, the prosecution's improper questions were designed to demean and ridicule him.  The prosecutor repeatedly, he asserts, accused him of altering his testimony to correspond with other witnesses, thus, implying that he had done something untoward by simply participating in his own trial.  The prosecutor also classified the act of testifying as a "[H]ail [M]ary."  He argues that the prosecution's repeated derisive remarks about defendant casting "blame" and altering his story were wholly inappropriate.

¶ 74    The State responds that defendant has forfeited the issue because, while defense counsel objected to some questions during cross-examination, defendant did not include the issue in his posttrial motion, defendant does not address plain-error review in his appellant's brief, the questions must be considered in the context of the entire cross-examination, and, in any event, any error was harmless because the evidence of defendant's guilt was strong.

¶ 75    The State maintains that the questions "were mostly proper attempts to subject defendant to cross-examination and impeachment."  It notes that the trial court sustained objections to two of the questions and that the court did not abuse its discretion in overruling objections to other questions, because they constituted fair attempts at attacking defendant's credibility.  The prosecution showed that, when he spoke to police, defendant did not tell them that Story was the person that had shot and killed Devost.  Rather, the State notes, defendant admitted that he lied to the police and publicly stated for the first time at trial that Story, not defendant, was the shooter. The State asserts that this was a valid avenue for the prosecution to explore on cross-examination. Furthermore, the State argues that *Schaffer* is distinguishable, because there was little or no

evidence in that case corroborating the victim's testimony.[2] Here, it asserts, the evidence was not closely balanced; rather, Story's testimony was corroborated by: (1) Mance's testimony that he saw a gun sticking out the front passenger window of Story's vehicle; (2) the fact that the shell casings, as the prosecution argued, could not have been found in the street if Story had shot the gun; (3) a BP surveillance video, which showed a flash outside the passenger side of Story's vehicle, a reasonable inference from which was that the flash would not have been seen if Story, not defendant, had fired the shots; and (4) inferences from the trajectory evidence that supported the argument that Story could not have fired the bullets, but that defendant, the front passenger, could have fired them.

¶ 76    In reply, defendant asserts that, although his posttrial motion did not contain the cross-examination issue, he did argue that the State should not have been allowed "to argue the impossibility of [ ] [d]efendant's version of [the] events when the so-called lay evidence, scientific evidence was not even vetted[.]"  Alternatively, defendant asks that, if we find the issue forfeited, we review the issue for plain error.  See *People v. Ramsey*, 239 Ill. 2d 342, 412 (2010) (the defendant's inclusion of plain-error argument for the first time in his reply brief sufficient to allow court to review the claim for plain error).

¶ 77    We conclude that the cross-examination issue is forfeited, but we choose to review it for plain error.

> "[T]he plain-error doctrine bypasses normal forfeiture principles and allows a reviewing court to consider unpreserved error when either (1) the evidence is close,

_____

[2] It also notes that the jury in that case sent three notes to the judge after deliberations commenced, indicating that they were split on all three counts.

regardless of the seriousness of the error, or (2) the error is serious, regardless of the closeness of the evidence. In the first instance, the defendant must prove 'prejudicial error.' That is, the defendant must show both that there was plain error and that the evidence was so closely balanced that the error alone severely threatened to tip the scales of justice against him [or her]. *** In the second instance, the defendant must prove there was plain error and that the error was so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process. [*People v. Keene*, 169 Ill. 2d 1, 17 (1995).] Prejudice to the defendant is presumed because of the importance of the right involved, 'regardless of the strength of the evidence.' (Emphasis in original.) [*People v. Blue*, 189 Ill. 2d 99, 138 (2000).] In both instances, the burden of persuasion remains with the defendant." *People v. Herron*, 215 Ill. 2d 167, 186-87 (2005).

¶ 78    The defendant must first establish that a clear or obvious error occurred. *People v. McLaurin*, 235 Ill. 2d 478, 497-98 (2009).

¶ 79    The federal and state constitutions guarantee all criminal defendants a fair, orderly, and impartial trial. U.S. Const., amend. XIV, § 1; Ill. Const. 1970, art. 1, § 2; *People v. Blue*, 189 Ill. 2d 99, 138 (2000). To determine whether a defendant was denied a fair trial, "we ask whether a substantial right has been affected to such a degree that we cannot confidently state that [the] defendant's trial was fundamentally fair." *Blue*, 189 Ill. 2d at 138. In determining whether the trial was fundamentally fair, we look to whether the prosecutor's misconduct was a material factor in the defendant's conviction or whether the defendant was substantially prejudiced. *People v. Linscott*, 142 Ill. 2d 22, 28 (1991).

"The defendant who takes the stand and testifies in his [or her] own behalf in a criminal case not only offers himself [or herself] as a witness in his [or her] own behalf but

thereby subjects himself [or herself] to legitimate cross-examination. *People v. Burris*, 49 Ill. 2d 98, 104 (1971). Although cross-examination is generally limited to the subject matter inquired into on direct examination, this rule has been modified to the extent that it is proper on cross-examination to develop all circumstances within the knowledge of the witness that explain, qualify, discredit or destroy his [or her] direct testimony, even if such examination constitutes new matter that aids the cross-examiner's case. *People v. Williams*, 66 Ill. 2d 478, 486 (1977). Additionally, '[a]ny permissible matter which affects the witness's credibility may be developed on cross-examination.' *People v. Kliner*, 185 Ill. 2d 81, 130 (1998)." *People v. Stevens*, 2014 IL 116300, ¶ 16.

¶ 80     "A trial court has discretion to allow the prosecution wide latitude during cross-examination of the defense witnesses." *People v. Shelton*, 401 Ill. App. 3d 564, 582 (2010). Yet, it is improper to question a defendant about the truthfulness of other witnesses, because such questions invade the jury's function of determining for itself the credibility of witnesses. *People v. Evans*, 373 Ill. App. 3d 948, 961 (2007). "While it is permissible to cross-examine a witness in order to explain, modify[,] or discredit what he [or she] said on direct examination, cross-examination that is designed to harass, annoy[,] or humiliate a witness should not be tolerated." *People v. Baugh*, 358 Ill. App. 3d 718, 739 (2005).

¶ 81     Some of the prosecutor's questions were argumentative and unprofessional. We do not condone them. However, the substance of the questions essentially challenged defendant's credibility and, in total, did not harass, annoy, or humiliate him. Further, any error was cured by the trial court's sustaining of two objections, specifically, to the "[H]ail [M]ary" comment and the question asking whether defendant had changed his testimony in response to other testimony at trial. See, *e.g.*, *In re Commitment of Butler*, 2013 IL App (1st) 113606, ¶ 54 ("Generally, if a

timely objection is made at trial to improper interrogation, the court can cure the error by sustaining the objection or instructing the jury to disregard the question and answer."). The prosecutor's questioning highlighted that Story's testimony differed from defendant's and that, even without Story's testimony, the evidence supported the conclusion that defendant was the shooter. Although poorly phrased in argumentative terms that could have been avoided, the prosecutor's characterization of defendant's position as a final desperate act to avoid a conviction ("you had to come in here today and blame somebody, didn't you?") was not entirely inaccurate. He placed his testimony before the factfinder hearing his case—here, the jury—and the prosecution was entitled to challenge his version of the events and his overall credibility. Further, as the State notes, defendant admitted to lying to the police.

¶ 82    We agree that *Schaffer* is distinguishable from this case. In *Schaffer*, the challenged questions clearly asked defendant to opine on another witness's credibility, which is improper, because it invades the factfinder's function. *Evans*, 373 Ill. App. 3d at 961. Here, in contrast, the prosecutor's questions focused only on defendant's credibility.

¶ 83    We cannot conclude that the questioning substantially prejudiced defendant. At worst, the questioning at issue was unnecessarily argumentative, but, given the strength of the evidence against him, it did not deprive defendant of a fair trial and, in any event, was harmless. Lind, the forensics expert who examined Story's pistol, testified that casings from Story's pistol ejected up and to the right; he did not, for example, testify that they ejected backwards (and presumably back into the vehicle). Police found casings from the weapon on Green Bay Road, which reasonably supported an inference that the gun was shot, if not completely outside, at least partially outside and *not* completely inside the front passenger door of Story's vehicle. Consistent with this evidence was Mance's testimony, which was highly damaging for defendant, as he told police that,

when Story's vehicle pulled up to the Escalade, he saw someone stick their arm out of the passenger-side window and shoot. The BP gas station surveillance video showed the two vehicles next to each other as they approached the intersection of Green Bay Road and Martin Luther King Drive and showed sparks from the passenger side once they reached the intersection. Finally, Helgesen's trajectory testimony, as we discuss below, reasonably supported an inference that the first bullet, which entered the rear driver's side door of the Escalade at about 90 degrees, entered Devost's left hip and was shot by defendant, not Story, who would have faced obstructions to a direct 90-degree shot at Devost.

¶ 84    In summary, as there was no error, we honor the procedural default, and, in any event, any error was harmless.

¶ 85                              B. Closing Argument

¶ 86    Next, defendant argues that the prosecution's closing arguments about trajectory were inappropriate, as they amounted to expert opinion given in the absence of any expert testimony. He maintains that nothing in Helgesen's exhibits or his testimony showed that it was physically impossible for Story to have shot the gun and, therefore, the prosecution could not have inferred any of what it argued from the evidence actually presented.

¶ 87    In *Wheeler*, 226 Ill. 2d at 123, the supreme court noted:

   "Prosecutors are afforded wide latitude in closing argument. *People v. Caffey*, 205 Ill. 2d 52, 131 (2001). In reviewing comments made at closing arguments, this court asks whether or not the comments engender substantial prejudice against a defendant such that it is impossible to say whether or not a verdict of guilt resulted from them. *People v. Nieves*, 193 Ill. 2d 513, 533 (2000). Misconduct in closing argument is substantial and warrants reversal and a new trial if the improper remarks constituted a material factor in a

defendant's conviction. *People v. Linscott*, 142 Ill. 2d 22, 28 (1991). If the jury could have reached a contrary verdict had the improper remarks not been made, or the reviewing court cannot say that the prosecutor's improper remarks did not contribute to the defendant's conviction, a new trial should be granted. *Id.*"

¶ 88 A closing argument must be viewed in its entirety, and the challenged remarks must be viewed in their context. *People v. Buss*, 187 Ill. 2d 144, 244 (1999). The trial court may cure errors by giving the jury proper instructions on the law; informing the jury that arguments are not themselves evidence and must be disregarded if not supported by the evidence at trial; or sustaining the defendant's objections and instructing the jury to disregard the inappropriate remark. *People v. Kidd*, 175 Ill. 2d 1, 50-54 (1996); *Pasch*, 152 Ill. 2d 133, 185 (1992). It is "improper for the prosecutor to argue assumptions or facts not based upon the evidence in the record." *People v. Kliner*, 185 Ill. 2d 81, 151 (1998). A prosecutor may argue facts and reasonable inferences drawn from the evidence, even if these inferences are unfavorable to the defendant. *People v. Anderson*, 407 Ill. App. 3d 662, 667 (2011). A prosecutor commits misconduct by misstating the evidence or misleading the jury as to what inferences it may draw. *People v. Wilson*, 92 Ill. App. 3d 370, 383 (1981).

¶ 89 Here, the trial court ruled that Helgesen would be precluded from offering expert testimony or opinion, but that he could testify as a lay witness about his use of the trajectory kit. (There is no dispute that Helgesen testified within the parameters set by the court.)

¶ 90 During closing arguments, the prosecutor stated that there "is not a huge margin of error" for the trajectory evidence, because "[w]e are dealing with a bullet hole," not "a crater." The prosecutor also argued that the photographs of the other bullet holes showed that the angles of the

bullets became increasingly "sharper," which was "critical" information, "[b]ecause it tells us what happened." The prosecutor also stated:

"Again, there is no damage on [Story's] car, the window line, to the weather stripping. It's because he didn't shoot, ladies and gentlemen.

It is *implausible* for the driver of that car to make these angles from where he's seated and from driving.

It's *implausible* because there is a headrest. There is a window in the back seat and there are three other people in his car and his siblings." (Emphases added.)

¶ 91 Further, on rebuttal, the prosecutor stated:

"So now, the Defense wants you to believe that somehow these bullets magically made the turn and went into [*sic*] at 125 degrees at [bullet hole] 2 or at 3. *Impossible*.

\*\*\*

So, now, [Northern], he can't get the shot. There is no way that I can make this shot unless he's shooting like this, which is *impossible*.

\*\*\*

Defense counsel even stated: We admit all the bullets went out of our window.

It's physically *impossible* for Zachary Story to have been the shooter if all the bullets went out of the passenger window in that vehicle." (Emphases added.)

¶ 92 Defendant argues that, even though it had not provided any expert testimony, the prosecution argued an expert opinion. He maintains that the prosecutor's statements were not based on anything officer Helgesen testified to and that the conclusion argued by the prosecutor required knowledge not common to lay persons.

¶ 93    Defendant relies on *People v. Stevens*, 2018 IL App (4th) 160138.  In that case, the defendant was charged with predatory criminal sexual assault of a child.  During closing arguments, the prosecutor commented about how cunning or calculating sexual offenders are and how it is something the prosecution sees on a daily basis.  The reviewing court held that the comments were not presented as evidence at trial and rejected the State's argument that the statements were permissible based on the jury's common knowledge.  *Id.* ¶ 61.  "[T]he State was inferring knowledge of the habits of sexual predators as a matter of common knowledge." *Id.*  The court further determined that the cumulative effect of this error and others in the trial constituted, along with the closely-balanced evidence, plain error warranting a new trial.  *Id.* ¶ 75.

¶ 94    Here, defendant argues that, as in *Stevens*, the prosecutor's statements went well beyond commenting on what everyone knows about firearms and trajectory of bullets.  He again notes that Helgesen never stated that anything was impossible or improbable and could not have done so, because he did not testify as an expert witness.  The photos of his projections, defendant maintains, which depict the bullet holes, rods, and laser projections, do not show that it was physically impossible for Story to have shot the gun.

¶ 95    The State responds that defendant has forfeited the claim regarding the trajectory evidence, because he did not object to the argument or include the issue in his posttrial motion.  It further argues that, in any event, the remarks were based on reasonable inferences from the evidence at trial and were harmless.

¶ 96    First, we agree with the State that defendant's argument is forfeited, because he did not object to the prosecutor's comments during closing argument and did not raise the issue in his posttrial motion, where he merely argued that the court erred in admitting the trajectory evidence as lay evidence.  *People v. Wilson*, 2017 IL App (1st) 143183, ¶ 22 (to preserve issue for appeal,

a defendant must object at trial and raise issue in a posttrial motion; failure to do so results in forfeiture).

¶ 97    Defendant requests in his reply brief that we address the issue for plain error, to which we turn next.  Our initial inquiry is whether a clear or obvious error occurred.  *McLaurin*, 235 Ill. 2d at 497-99).  We conclude that the prosecutor's comments constituted reasonable inferences from Helgesen's testimony and, therefore, no error occurred (and we honor the procedural default). Further, in any event, any error was harmless, given the strength of the evidence against defendant.

¶ 98    Helgesen explained how he used the rods to project the path of the shots fired from Story's SRX by inserting each rod where a bullet made two holes.  He also explained how he used a protractor to measure the angles of the pathways.  We believe that the projections and angle-measurement concepts were easily within the average juror's understanding.

¶ 99    As the prosecutor reasonably argued, the bullet that struck Devost was the one that went through the rear passenger door, as that was the only pathway that led to his body.  Dr. Witeck's testimony supported this inference, as he testified that the trajectory of the bullet through Devost's body began at the left hip, traveled through his abdomen, and then lodged on the right side of his pelvis.  Helgesen measured the pathway angle at 90 degrees.  Story testified that he pulled up next to the Escalade, and the BP gas station surveillance video showed that the vehicles were next to each other as they approached the intersection of Green Bay Road and Martin Luther King Drive. Moreover, sparks, which the prosecutor argued were gunshots, appeared from the passenger side of Story's vehicle before the vehicles turned in opposite directions onto Martin Luther King Drive. During closing, the prosecutor acknowledged Helgesen's testimony that there was a margin of error with his measurements.  The prosecutor asked the jury to use their "common sense."  He noted Mance's statements during his police interview soon after the shooting, which were admitted

substantively, that he saw an arm come out of the passenger side of Story's vehicle and that shots started being fired. Lind, the forensics expert, testified that the shell casings from Story's gun ejected up and to the right of the firearm. The prosecutor reasonably argued that a permissible inference was that the shell casings could not have been found in the street if Story, who was seated in the driver's seat, fired the gun. We agree with the State that Mance and Lind's testimony corroborate the prosecutor's closing argument inferences from Helgeson's testimony. There was no error in the prosecutor's comments, and defendant was not denied a fair trial.

¶ 100  Defendant's reliance on *Stevens* is misplaced, as the comments in that case concerned a class of offenders whom the prosecutor characterized in a negative way and about whom the prosecutor represented were frequent defendants, all matters that were determined to be beyond the common knowledge of the average juror and were not evidence presented at trial. Here, in contrast, the prosecutor utilized not only Helgesen's calculations, which we conclude were within the average juror's understanding, but also the other evidence noted above. Also, there was evidence presented to support the argument in this case, whereas, in *Stevens*, there was no evidence to support the argument; rather, it was supported by the prosecutor's experience.

¶ 101  Nor are we troubled by the prosecutor's use of the terms "implausible" or "impossible." First, "implausible" means not plausible, which, in turn, is defined as "[c]onceivably true or successful; possibly correct or even likely." *Plausible*, Black's Law Dictionary (11th ed. 2019). It was not erroneous to infer from the lay trajectory evidence that it was possibly *incorrect* that Story was the shooter, as this merely presents a potentiality. Second, the prosecutor used the term "impossible" on three occasions during rebuttal and, during one of those instances, he stated that it would have been impossible for Story to have been the shooter if the bullets came out of the passenger window of his vehicle. This was not an inference based only on Helgesen's testimony,

as it was also a comment on the fact that Story was in the driver's seat and it was inconceivable that his arm could reach out of the passenger window to shoot a gun. It was also based on the fact that the shell casings were found on the road (and presumably shot from the window by the passenger) and not in his vehicle (which is where they presumably would have been found if the shots were fired from the driver's seat and given that the casings ejected to the right of the weapon). The prosecutor's other two uses of the term "impossible" occurred in reference to Northern's testimony that he "took off" after he heard the gun shots, *i.e.*, accelerated, and that the angle of the shots after the first shot (which struck Devost) was increasing per Helgesen's calculations: "So, now, [Northern] he can't get the shot. There is no way that I can make this shot unless he's shooting like this, which is impossible," and "So now, the Defense wants you to believe that somehow these bullets magically made the turn and went into [*sic*] at 125 degrees at [bullet hole] 2 or at 3. Impossible." This comment presumably referenced the obstructions Story would have faced to a direct 90-degree shot at Devost, which was a reasonable inference, in our view. Further, even if this was an unreasonable inference from the trajectory evidence, it did not taint the trial, as it was a single comment and, in any event, as noted above, the evidence against defendant was strong and any error was harmless. See *People v. Johnson*, 119 Ill. 2d 119, 143-44 (1987) (prosecutor's opinion that a license plate would have been " 'impossible' " to read was based on testimony concerning the distance from which a defense witness testified to have observed the plate and the height of the letters on the plate; prosecutor's confusing comparison between reading the plate and a magazine from a distance did not render the trial unfair).

¶ 102   As there was no error in the closing argument comments, there can be no plain error, and we honor the procedural default.

¶ 103                          C. Combined Effect of the Alleged Errors

¶ 104   Defendant contends that the combination of improper conduct—the cross-examination of defendant and the closing argument comments—could have tipped the scales against him. Because we have found no error as to either of defendant's claims, we cannot conclude that the combined effect of the challenged conduct denied defendant a fair trial.

¶ 105                                III. CONCLUSION

¶ 106   For the reasons stated, we affirm the judgment of the circuit court of Lake County.

¶ 107   Affirmed.