(No. 16496.—Reversed and remanded.)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* FRANK MILLER, Plaintiff in Error.

*Opinion filed February 17, 1925.*

1. CRIMINAL LAW—*when conviction for receiving stolen property cannot be upheld.* A judgment of conviction for receiving stolen property, which was the sole offense charged in the indictment, cannot be upheld where the evidence fails to show that the defendant ever had possession of the property, the only inference from the evidence being that he may have been the thief or was interested in some way in disposing of the property or was aiding in concealing it.

2. SAME—*aiding in concealing stolen property is an offense separate from receiving it.* Aiding in concealing stolen property is an offense separate from receiving stolen property, and where the theft is a single transaction one cannot be convicted both for stealing the property and receiving it after it was stolen.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. MARCUS KAVANAGH, Judge, presiding.

O'BRIEN, PRYSTALSKI & OWEN, (WILLIAM S. FORREST, of counsel,) for plaintiff in error.

EDWARD J. BRUNDAGE, Attorney General, ROBERT E. CROWE, State's Attorney, VIRGIL L. BLANDING, and ALBERT D. RODENBERG, (HENRY T. CHACE, JR., and EDWARD E. WILSON, of counsel,) for the People.

Mr. JUSTICE FARMER delivered the opinion of the court:

Frank Miller, plaintiff in error, and Frederick E. Frain, Howard P. Blackford, Thor A. Wassburg, Julian C. Ryer, Herbert Hanna, Graham S. McGill and Spencer Brown, were indicted in the criminal court of Cook county for receiving stolen property for their own gain and to prevent the owners of the property from again possessing it. The property described in the indictment as having been stolen was alleged to have been of aggregate value of $400,000

and which consisted of promissory notes, negotiable bonds and jewelry. The property was alleged to belong to George Julian, Jessie Haberkamp, Georgiana Redick, Agnes Harder and Lydia D. Ehrhardt. It was stored in the vault of Werner Bros., a fire-proof storage company. The vault was forcibly entered between the evening of Saturday, October 13, 1923, and the morning of Monday, October 15. Private deposit boxes in the vault were broken open and the property stolen. None of the persons indicted except plaintiff in error, Miller, Brown and Hanna were placed on trial. At the conclusion of the People's testimony the State's attorney *nollied* the indictment as to Hanna and requested the court to call Hanna as a witness, which the court did. Miller and Brown were found guilty, and after overruling motions for a new trial and in arrest they were sentenced to imprisonment in the penitentiary. Separate verdicts were returned as to them, finding each of them "guilty of receiving stolen property, knowing the same to be stolen, for the defendant's own gain and to prevent the owner from again possessing the same," in manner and form as charged in the indictment, and the value of the property so received was found to be $24,500. Miller, alone, prosecuted this writ of error. McGill, Blackford, Frain and Wassburg testified for the prosecution.

It is earnestly contended by counsel that the evidence did not warrant the verdict of guilty as to plaintiff in error.

The testimony is a most astounding narrative of the conduct of conscienceless scamps in connection with the stolen property. The persons who were indicted and who testified for the prosecution claimed to be business men engaged in legitimate business, such as bond salesmen, promoters, taxi-cab dealers, etc. A brief outline of the testimony is, that two or three days after the robbery of the vault, Spencer Brown, who described his business as mechanical dentistry, called upon McGill, who maintained an office in Chicago in the Westminster building, and talked

to McGill about disposing of some bonds for Brown, and the parties agreed McGill would dispose of them and turn over to Brown sixty-five per cent of the proceeds of the sale, less ten per cent commissions for McGill. A day or two later Brown gave McGill a bunch of industrial bonds for sale. McGill called on Wassburg, who said he was a bond salesman in the office of the Mortgage Security Company, in the Women's Temple building, to dispose of the bonds. Wassburg was to receive thirty-five per cent of the proceeds of the sale. Wassburg took the bonds to Howard Blackford and Fred Frain, whose offices were in the same building as Wassburg's, and who, we understand, were officers of the Mortgage Security Company but were engaged in the business, in another office, of buying and selling taxicabs. Blackford and Frain were to dispose of the bonds and they and Wassburg were to receive thirty-five per cent of the proceeds of the sale. It was Thursday, October 18, Wassburg said he delivered the bonds to Blackford and Frain. Later in the day Blackford and Frain told Wassburg they had taken the bonds to Ryer, who they said was a broker and an officer of a west side bank, and he had taken the bonds out to the bank and that they could not get the money on them before the next morning. Wassburg and McGill were nervous and uneasy at the delay and had several interviews that day and the next day, in some of which, at least, Brown was present and manifested great uneasiness at the delay and was insistent that the bonds be returned immediately. The next morning, after the bonds were delivered to Blackford and Frain, they reported to Wassburg that Ryer, who was a lawyer, had gone out to the bank and they expected to hear from him very soon. In the meantime Wassburg and McGill were getting more nervous and had numerous communications. Later in the day Blackford and Frain exhibited a letter to Wassburg which purported to be from the West Central State Bank, addressed to Julian C. Ryer, stating the bank was holding

the bonds Ryer had presented them as security for a loan to him, for investigation as to the ownership of and title to the bonds. The bank asked the co-operation of Ryer with detective headquarters in making the investigation. The letter was a forgery and was prepared by Ryer, Blackford and Frain for the purpose, as the two latter testified, of "double-crossing" Wassburg and causing him "to fade out of the picture." All the parties said they understood the bonds were "hot" bonds, or that they were stolen. Blackford, Frain and Ryer agreed to, and did, divide up the bonds among the three of them, leaving Wassburg, McGill and Brown, as they said, "out of the picture." They disposed of part of them and had used the money before they were arrested. In the meantime things appeared to get very exciting between Brown, McGill and Wassburg and numerous interviews and conferences were had at McGill's office. At one of them two men appeared who had not before figured in the transaction. There had been, before their appearance, talk of Brown that somebody would get "bumped off," and McGill reported to Wassburg that gunmen were shadowing and following him. When these two men appeared at McGill's office, one of them, a heavy-set man, who was identified by McGill as plaintiff in error, Miller, talked very threateningly about their failure to account for the bonds, or the money for them, which Brown had delivered to McGill; said someone would be "bumped off," and advised Wassburg to leave town. Miller was accompanied by a slim man, whose name is not in the record. Blackford, Frain, Wassburg and McGill, who testified for the prosecution, said they had not been promised immunity, but they hoped they would not be sent to the penitentiary and hoped for leniency on the part of the prosecution.

Miller contends several errors were committed on the trial in the admission of testimony, giving and refusing instructions and in the conduct of the State's attorney in his argument to the jury, and some other errors are alleged,

but the error which relates most to the merits of the case is that the evidence did not justify the verdict as to Miller.

The indictment charged all the defendants named in it, feloniously, unlawfully, for their own gain and to prevent the owners from again possessing their property, with buying, receiving and aiding in concealing the property. A separate verdict was returned as to each defendant, finding him guilty of receiving stolen property, knowing the same to be stolen, for his own gain and to prevent the owners from again possessing it. Miller did not testify and offered no proof.

There was no proof offered by the prosecution as to who committed the robbery and stole the property from the safety vault. The indictment charged all the defendants with knowingly receiving stolen property for their own gain. The proof shows Brown, McGill, Wassburg, Blackford, Frain and Ryer did receive and have possession of the property and shows they considered it stolen property when they received it.

There is no testimony in the record, unless it be the reference made by Miller in McGill's office to bonds delivered by Brown to McGill, upon which to base a conclusion that Miller ever received or had possession of the property. That statement made by Miller indicated he regarded himself as being interested in the property and the disposition to be made of it, but whether that interest was by reason of his being one of the thieves who stole it and delivered it to Brown to be disposed of, or whether he was a gunman employed by the thieves who stole the property to recover it back for them, or whether the property had been delivered by the thieves to him to dispose of and he had delivered it to Brown, cannot be determined from the evidence. He was charged in the indictment with the statutory offense of receiving stolen property for his own gain and to prevent the owners from again possessing their property and was found guilty of that charge. It is permissible to

include in different counts of one indictment larceny and receiving stolen property against one or more defendants, and the indictment will not be quashed because the charges are of distinct crimes committed at different times. (*People* v. *Goodman,* 283 Ill. 414.) Here the indictment only charged one crime,—receiving stolen property. It did not charge Miller with aiding to conceal stolen property, which is an offense separate from receiving it. The jury found Miller guilty of the only offense with which he was charged. In the absence of any testimony other than Miller's conduct and remark in the office of McGill, can it be said the proof shows, beyond reasonable doubt, his guilt of receiving stolen property? It may be Miller stole the property, or that he was employed by someone who did steal it to aid recovering it from McGill and conceal it, but he was not indicted for either of these offenses. Where the theft is a single transaction a man cannot be convicted for both stealing and receiving the stolen property. (*Tobin* v. *People,* 104 Ill. 565.) As we understand the argument of the People, it is that the proof was sufficient to show Miller aided in concealing the property, but, as before said, he was not indicted for nor found guilty of that offense. The proof shows Miller, as well as all the other indicted parties who testified for the prosecution, was far from being a good citizen. It may be highly probable Miller committed some crime for which he should be punished, but his guilt of the crime charged in the indictment should be proved beyond reasonable doubt. Even bad men cannot be convicted and imprisoned on general principles. No matter what the character of the defendant, we cannot approve a conviction which would deny him rights guaranteed by the constitution.

Because the proof did not show beyond reasonable doubt Miller was guilty of the crime charged against him, the judgment is reversed and the cause remanded.

*Reversed and remanded.*