2024 IL App (1st) 230729-U

SIXTH DIVISION
December 20, 2024

No. 1-23-0729

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 20 CR 05724 |
| | ) | |
| | ) | |
| BYESHON GENUS, | ) | Honorable |
| | ) | Dominica Stephenson, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

PRESIDING JUSTICE TAILOR delivered the judgment of the court.
Justices C.A. Walker and Gamrath concurred in the judgment.

## ORDER

¶ 1    *Held*:    The State failed to prove defendant guilty beyond a reasonable doubt of one count of predatory sexual assault. Counsel was not ineffective. Defendant was not denied a fair trial and was not subject to double enhancement of his sentence.

¶ 2    Following a jury trial, defendant Byeshon Genus was convicted of three counts of predatory sexual assault (720 ILCS 5/11-1.40(a)(1) (West 2020)) and two counts of criminal sexual assault (720 ILCS 5/11-1.20(a)(3) (West 2020)). He was sentenced to a total of 65 years' imprisonment. On appeal, Genus argues: 1) the State failed to prove him guilty beyond a reasonable doubt of one count of predatory sexual assault; 2) he was denied a fair trial as a result of the State's improper questions during cross-examination and improper argument in rebuttal

closing argument; 3) he received ineffective assistance of counsel; and 4) he was subjected to an improper double enhancement of his sentence. For the following reasons, we reverse Houston's conviction for predatory sexual assault under count II, vacate his 15-year sentence for that count, and affirm the remainder of the judgment.

¶ 3                               I. BACKGROUND

¶ 4       Genus was indicted for three counts of predatory sexual assault (720 ILCS 5/11-1.40(a)(1) (West 2020)) alleging that he made contact between 1) his penis and his step-daughter, D.G.'s, sex organ (count I), 2) his penis and D.G.'s mouth (count II), and 3) his finger and D.G.'s sex organ (count III), all while D.G. was under 13 years of age. The indictment also included two counts of criminal sexual assault (720 ILCS 5/11-1.20(a)(3) (West 2020)) alleging that Genus made contact between his penis and D.G.'s sex organ and between his mouth and D.G.'s sex organ, while being a family member. On January 20, 2023, a jury found Genus guilty of all five counts.  He was sentenced to 65 years' imprisonment.

¶ 5       The following evidence was adduced at trial. Reva Williams testified she met Genus in 2012, and within a couple of months, Genus moved in with Williams and her three children. In January 2014, Williams gave birth to twin girls, fathered by Genus. Williams stated that Genus "tried to be a stepfather" to her older three, but was "kind of mean," and explained that he would "try to stir up arguments with the kids. Like fabricating stuff a lot to start arguments." She admitted that her relationship with Genus was challenging and that they fought over money. Williams suspected that Genus was cheating on her.

¶ 6       Genus would hit the children when disciplining them and Williams witnessed Genus "whip" her son with a belt and "smack" one of her daughters. Genus also scratched her oldest daughter, D.G. Williams relayed another incident where Genus was loud and angry with D.G.

and had D.G. "cowering in a corner… like he was going to hit her." Genus grabbed D.G. by the arms and raised his fist to her head. Williams screamed, "Don't put your hands on my kid," and threatened to call the police. Genus left and later sent Williams a message over Facebook Messenger, threatening to shut off the utilities in her home. Williams told Genus that she was calling the police to "tell them you touched my kid." She explained that by "touch," she meant "striking" her children.

¶ 7    D.G., who was 17 years old at the time of trial, testified that Genus lived with her from the time she was seven until she was thirteen. She testified that Genus disciplined her by hitting her in the head or slapping her and would also hit her brother and sister on the back of the head and hit them with belts. He scratched her one time. Genus never hit the twins. D.G. testified that her mom knew Genus hit her but never called the police or took pictures.

¶ 8    When her mom was not around, Genus was nice to D.G. when he wanted to "touch [her]." D.G. described an incident when she was nine or ten years old where Genus "put [her] on his lap and made [her] start grabbing on him." Genus put his hands on D.G.'s waist and legs and "started moving them back and forth." D.G. could feel his penis on her leg.

¶ 9    D.G. was ten or eleven when Genus started touching her in what she considered a sexual way, such as inserting his fingers into her vagina. D.G. testified that before she had bunk beds, she slept on the floor in her sister's room. Genus would wake her up early by touching her vagina with his hands. When Genus finished, he would tell her to get ready for school. D.G. was 12 when she first got her period. Sometimes, Genus would put his naked penis between D.G.'s legs while she was clothed and put his penis in her mouth. When she would "tell him that I was on my period. He used to put it in my mouth." D.G. stated Genus touched her vagina with his hands "a lot of times" before he started having intercourse with her.

¶ 10    D.G. was 12 years old when Genus first put his penis in her vagina. She testified that Genus gave her his phone and told her to go watch it in the bathroom. When she pressed play, she saw a video of people having sex. D.G. then went to her bedroom and was watching her tablet in bed when Genus came into her room. Genus turned her over and made her slide to the edge of the bed. Genus then removed his pants. He pulled up D.G.'s nightgown, pulled down her underwear and put his penis inside her vagina. Genus ejaculated, but not inside her.

¶ 11    One time Genus came into her room in the middle of the night and climbed into her bottom bunk. Genus put his penis in D.G.'s vagina then ejaculated into his hands. She also described how "after he got done raping me . . . he would put it in my mouth." She described one instance, in her mom's bedroom, when Genus put his penis in her mouth after intercourse.

¶ 12    D.G. detailed another incident when Genus picked her up from her grandma's house and stopped at his mom's apartment on the way home. D.G. went into the apartment with him and sat on the living room couch. Genus came into the living room, touched D.G.'s arms and legs and pulled down her pants. He then knelt on the ground in front of her and put his tongue on her vagina. Genus then got up, kneeled on the couch, and put his penis inside her vagina. Genus ejaculated and went to the bathroom to clean up, returning with a towel. He handed the towel to D.G. and told her to clean herself because "you don't want to go home smelling like sex." D.G was probably 12 or 13 at the time.

¶ 13    The last time Genus sexually assaulted D.G. was in August 2019 when she was 13 years old. She was getting ready to go to her cousin's house. As Genus came out of the bathroom, D.G. walked towards the bathroom to take a shower. While they were standing in the hallway, Genus touched D.G.'s arms and legs and then pulled her pants down. He put his hands around D.G.'s waist, and from behind, stuck his penis inside her vagina and ejaculated. When asked if he

4

ejaculated inside her vagina or somewhere else, D.G. stated somewhere else. D.G. then showered and went to her cousin's house as planned.

¶ 14     A few days later, D.G. overheard her mom and Genus arguing about infidelity. Williams exclaimed that she "was going to go get [her]self checked out for STD's." D.G. testified that she was afraid that she might also have a sexually transmitted disease because "Genus was raping [her] at the time." When Genus left, D.G. told her mom that Genus "was raping [her]." Williams "freak[ed] out."

¶ 15     Williams called the police and then left to pick up her mom to bring her back to the house. During this time, Williams tried calling Genus and messaging him through Facebook, but he did not answer or respond. Williams ran into Genus's sister who called Genus, and when he answered, she put the call on speakerphone. Genus came back home and found D.G. downstairs and asked her, "are you serious?" D.G. did not respond, and Genus left.

¶ 16     Chicago Police officer Jimmie Coston and his partner arrived shortly thereafter. D.G., who appeared withdrawn, showed them areas of the house where the sexual assaults occurred. D.G. described each instance. While the police were at her house Williams received a Facebook message from Genus, which read, "I got what's been raping your daughter. She's a F-ing liar," and a photograph of a microphone was attached. Genus sent the same message to Williams' mother. They showed police, who photographed the message. The message and photograph was entered into evidence at trial.

¶ 17     D.G. testified that Genus only touched her while her mom was out or asleep. D.G. did not tell anyone that Genus was sexually abusing her, including her mom, because she was afraid. She came close to telling her mom once but then got scared and changed her mind. D.G. admitted that she told investigators she did not tell anyone because she was protecting her mom. When

asked on cross-examination to explain, D.G. advised that Genus "used to tell us about his past how he hurt people." D.G. believed his stories, and they scared her.

¶ 18     D.G. was taken to Stroger Hospital, and sexual assault nurse examiner Barbara Villanova performed a medical forensic examination, which included administering a sexual assault kit, on D.G. During the examination, Villanova observed ecchymosis which is a bruising or a bluish color on D.G.'s cervix. Villanova explained ecchymosis is caused by forceful penetration, consistent with D.G.'s description of sexual assault by Genus. When asked if ecchymosis could be caused by "self-infliction," Villanova explained that "any type of forceful penetration" can cause ecchymosis, but it is not likely to be caused by a tampon, for example. Villanova further explained that a child can be sexually assaulted and have a normal vaginal exam if the penetration was not forceful enough or simply because the vaginal area "heals pretty quickly on its own." Villanova also explained that sexual assault kits are only administered within seven days of the assault because as "patients will wash, shower, use the washroom," the chances of collecting any type of DNA diminishes. Villanova testified that D.G.'s examination occurred within the seven-day window for collecting DNA evidence. However, the forensic DNA testing from vaginal, anal and labia majora swabs showed no male DNA present.

¶ 19     The State entered D.G.'s birth certificate showing that she was born on August 27, 2005, and Genus' birth certificate showing that he was born in 1977, into evidence.  The State rested, and Genus moved for a directed finding, which the circuit court denied.

¶ 20     Genus testified that he met Williams through his sister in 2012 and that he lived with her for approximately three years between 2012 and 2014. He and Williams had twins who were born in January of 2014. Genus moved out later in 2014 and then moved back in 2016 until 2019. He testified that he and Williams fought a lot about money and women.

¶ 21    Genus testified that he worked during the time he and Williams were together and that he contributed financially. He described an argument he and Wiliams had about tax money on March 23, 2019, where he told Williams that he was "going to have the lights, the gas, and everything cut off, and she would never receive anything." Williams responded with a message threatening to tell the police that Genus had "touched her kid." Genus denied sexually assaulting D.G.

¶ 22    Defense counsel asked Genus, "[D.G.] says that you picked up the children and took her to your mother's house and had sex with her alone. Did that happen?" Genus said, "No," that he never took D.G. to his mother's house alone. Genus also denied touching any of Williams' children in a negative way, including hitting, scratching, or striking with a belt. Defense counsel asked Genus, "Now, today Reva Williams said that you were in a position with your hand up and then you grabbed her daughter while she was standing there. Did that happen?" Genus admitted it did happen and explained, "I was told she was messing with my xbox and I came in there and told her not to touch my property and that's when I grabbed her up off the floor."

¶ 23    Genus testified that he had an argument with Williams on August 8, 2019. Williams accused him of sleeping with other women, so he left. A short time later, his sister called; as a result of their conversation, he went back to the home he shared with Williams. Genus asked D.G. if she was serious about her accusations. He then went downstairs, and retrieved a microphone from D.G.'s drawer, which according to Genus, "was evidence that would prove my innocence." Genus claimed to have seen D.G. masturbating with the microphone six to seven months prior but had never told anyone. Genus then sent a text and photo of the microphone to Williams and her mother along with a "message stating that I wasn't going to fall victim to her, to the BS prior to previous statements, and I let her know that [D.G.] was lying." Genus

explained that he attached a photo of the microphone in the plastic bag to prove that the "sexual whatever was not caused by him."

¶ 24     On cross-examination, Genus denied taking D.G. to his mother's house and having sex with her there. The State cross-examined Genus on his accusation that D.G. was lying and asked Genus if D.G.'s accusation that he had sex with her at his mother's was a "big fat lie." The State also asked Genus if it was his testimony that D.G. "made up" allegations that he had sex with her in a hallway. The State also asked, "[D.G.'s] a liar?" Defense counsel objected, and the court sustained the objection. The State then pointed out, "that was [Genus's] – You used the phrase, you yourself texted that little girl's mother and said, she's a [expletive] liar. You said that, correct?" Genus answered, "Yes."

¶ 25     Genus also admitted sending the Facebook message to Williams that read, "I won't be the one in your [expletive]…I got my proof. I didn't touch that [expletive] liar." When questioned about the evidence that would prove his innocence, Genus stated that he never gave the microphone to the police.

¶ 26     The defense rested. The jury found Genus guilty on all five courts. Genus filed a motion for a new trial arguing the evidence was insufficient to prove him guilty beyond a reasonable doubt, the court erred in admitting certain evidence, and his convictions violated the one-act, one-crime rule. The court denied the motion. Genus was sentenced to three consecutive 15-year terms of imprisonment, one for each count of predatory criminal sexual assault, and two ten-year terms of imprisonment, one for each count of criminal sexual assault, also consecutive, for a total of 65 years in prison. Genus filed a motion to reduce his sentence which was denied.

¶ 27     This appeal followed.

¶ 28                                        II. ANALYSIS

¶ 29     Genus first argues that the State failed to prove that D.G. was under the age of 13 when he made contact between his penis and D.G.'s mouth, as necessary to sustain a conviction for predatory criminal sexual assault as alleged in count II. Unlike the other two predatory sexual assault counts, the State never asked D.G. how old she was when Genus put his penis in her mouth. However, it argues that evidence was still sufficient to convict because the jury could have reasonably inferred that D.G. was 12 at the time based on the circumstantial evidence. We disagree with the State because the circumstantial evidence leads to no more than speculation.

¶ 30     When reviewing the sufficiency of the evidence in a criminal case, we must determine whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *People v. Smith*, 185 Ill. 2d 532, 541 (1999). We will not reverse a criminal conviction unless the evidence is so unreasonable, improbable, or unsatisfactory as to create a reasonable doubt of the defendant's guilt. *People v. Rowell*, 229 Ill. 2d 82, 98 (2008). A reviewing court does not retry the defendant or substitute its judgment for that of the trier of fact with regard to the credibility of witnesses or the weight to be given to each witness's testimony. *People v. Jackson*, 232 Ill. 2d 246, 280-81 (2009). Rather, we "carefully examine the evidence while bearing in mind that the trier of fact is in the best position to judge the credibility of witnesses, and due consideration must be given to the fact that the fact finder saw and heard the witnesses." *People v. Herman*, 407 Ill. App. 3d 688, 704 (2011).

¶ 31     As alleged in count II, to sustain a conviction for predatory sexual assault, the State was required to prove that Genus, was "17 years of age or older, and commit[ted] an act of contact, however slight, between [his] sex organ * * * and the part of the body of another (D.G.'s mouth)

for the purpose of sexual gratification or arousal of the victim or the accused, * * *, and: (1) the victim [was] under 13 years of age." 720 ILCS 5/11- 1.40(a) (West 2020).

¶ 32    D.G. testified that Genus started touching her in a sexual way when she was nine or ten years old and had sexual intercourse with her starting when she was 12 years old. D.G. testified that she began menstruating at the age of 12. She testified that Genus put his penis in her mouth "more than once." She stated that sometimes, after intercourse, Genus would put his penis in her mouth. D.G. recalled a specific instance where she was in her mother's bedroom on the first floor and Genus put his penis in her mouth "after he got done raping me." D.G. also testified that Genus forced her to perform oral sex whenever she was menstruating. D.G. testified that "[w]hen [she] used to tell [Genus] that I was on my period. He used to put it in my mouth." The State clarified, "[s]o, the defendant, if you told him you had your period, he would put his penis in your mouth?" D.G. confirmed that this was correct. However, the State never elicited any testimony from D.G. that she was under the age of 13 when Genus put his penis in her mouth, as required to sustain a conviction for predatory sexual assault.

¶ 33    The State nevertheless argues that a reasonable inference could be drawn from the evidence that D.G. was under the age of 13 because the evidence established that D.G. was accustomed to telling Genus when she was menstruating, which started at age 12; that D.G. knew that Genus preferred oral sex when D.G. was menstruating; and that Genus forced D.G. to perform oral sex more than once when she was menstruating. The State urges that when we view "this intertwining evidence and the inferences naturally flowing from it in a light most favorable to the prosecution," we must conclude that a rational trier of fact could have determined that Genus forced D.G. to perform oral sex at age 12 because that is the age she began menstruating.

¶ 34    While it is necessary for the State to prove the elements of an offense beyond a

reasonable doubt, that may be done by resort to all the evidence, including the permissive inferences. *People v. Housby*, 84 Ill. 2d 415, 421 (1981); see also *People v. Bull*, 185 Ill. 2d 179, 205 (1998) (When weighing the evidence, the trier of fact is not required to disregard the natural inferences that flow normally from the evidence, nor is it required to search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt). "An inference is 'a conclusion as to the existence of a particular fact reached by considering other facts in the usual course of human reasoning.'" *People v. Steading*, 308 Ill. App. 3d 934, 940 (1999) (quoting Michael H. Graham, Cleary and Graham's Handbook of Illinois Evidence § 302.2, at 93 (7th ed. 1999)). We have affirmed a conviction for predatory sexual assault where the evidence supported an inference that the victim was under the age of 13. See *People v. Parlier*, 2023 IL App (4th) 220091 ¶¶ 73-76 (In a case of predatory criminal sexual assault, the testimony of the victim's mother was sufficient to prove that the victim was under 13 at the time of the offense because while the mother admitted she had done nothing to refresh her recollection of how the victim looked and sounded when under the age of 13, her ability to tell that her daughter was 8 or 9 in still photos and in an audio recording was not contrary to the laws of nature or universal human experience). However, there is a line between reasonable inference and mere speculation. *People v. Sanchez*, 2013 IL App (2d) 120445, ¶ 28. "A reasonable inference within the purview of the law must have a chain of factual evidentiary antecedents. If an alleged inference does not have a chain of factual evidentiary antecedents, then within the purview of the law it is not a reasonable inference but is instead mere speculation." *People v. Davis*, 278 Ill. App. 3d 532, 540 (1996).

¶ 35    We find that the State's evidence that D.G. was 12 when Genus put his penis in her mouth is speculation. On the other two predatory sexual assault counts where the victim's age

was an element, the State specifically elicited testimony from D.G. that she was under 13 years of age at the time of the assault. However, the State did not ask D.G. how old she was when Genus put his penis in her mouth. Moreover, we find untenable the inference that D.G. must have been 12 years old at the time because D.G. began menstruating at age 12 and Genus would put his penis in D.G.'s mouth when she was menstruating. First, although D.G. testified that Genus his penis in her mouth "more than once," the State never clarified with D.G. how many times Genus put his penis in her mouth. It could have been many times, or it could have been two times. Second, although D.G. testified that she began menstruating when she was 12, the State never asked her when after her 12th birthday she started menstruating. On this record, she could have started menstruating on the eve of her 13th birthday, so that Genus may not have put his penis in D.G.'s mouth when she was 12 years old. Third, D.G.'s outcry occurred one month before her 14th birthday, so there was an eleven-month period of time after D.G. turned 13 that Genus could have put his penis in D.G.'s mouth. The record antecedent facts are insufficient to draw an inference that D.G. must have been 12 when Genus put his penis in her mouth.

¶ 36    We recognize that child victims of sexual assault may not recall specific dates or their age at the time of the assault. For example, when D.G. was asked how old she was when Genus put his tongue on her vagina, D.G. testified, "Probably 12, 13." In its closing argument, the State simply glossed over the evidence of D.G.'s age when Genus put his penis in D.G.'s mouth, conflating it with D.G.'s testimony about how old she was when Genus put his penis and finger in D.G.'s vagina, the basis of the two other predatory sexual assault counts that he was charged with: "You heard her testify. You have her birth certificate. You saw the pictures of her when she was nine, when she was 13. She was under 13 when this started. She was under 13 when he put his penis in her vagina, when he put his penis in her mouth, when he inserted his fingers in

her vagina." The State did not even argue to the jury that it could draw a reasonable inference that D.G. was 12 when Genus put his penis in her mouth because that is how old she was when she began menstruating.

¶ 37     On this record, the jury was forced to speculate on how old D.G. was when Genus put his penis in her mouth. A reasonable inference is like a rubber band: stretch it too far and it snaps, becoming useless. See e.g., *Bakkan v. Vondran*, 202 Ill. App. 3d 125, 130 (1990) ("speculation" is an inference that dies from lack of facts). A fact is not established from circumstantial evidence unless the circumstances or events are so related to each other, so as to make the conclusion the only probable, not merely possible, one which can be drawn from them. *Id.* The State's evidence of D.G.'s age here lacks sufficient evidentiary antecedents to bear the weight of the inference the State seeks to draw. The State's evidence that D.G. was under the age of 13 is nothing more than a possibility, but possibilities are insufficient to sustain a criminal conviction. See *People v. Jackson*, 23 Ill. 2d 360, 365 (1961) ("We are not so naive as to ignore the very strong possibility, amounting perhaps to a probability, that the defendant was indeed in possession of the heroin. Mere probabilities, however, will not support a conviction. The language of *People v. Miller*, 315 Ill. 411, 416, seems highly appropriate to this case: 'It may be highly probable [defendant] committed some crime for which he should be punished, but his guilt * * * should be proved beyond reasonable doubt. Even bad men cannot be convicted and imprisoned on general principles.' ").

¶ 38     We find the evidence insufficient to establish that Genus was 12 years old when Genus put his penis in D.G.'s mouth as alleged in count II. It is simply not a reasonable inference from the evidence, even viewing the evidence in the light most favorable to the State as we are required to do. Consequently, we reverse Genus's conviction on this count and vacate the 15-

year sentence imposed.

¶ 39    Genus next argues he was denied a fair trial when the State engaged in prosecutorial misconduct when the prosecutor (1) asked him on cross-examination to comment on D.G.'s veracity, (2) relied on facts not established in evidence to imply consciousness of guilt during cross-examination, and (3) relied on facts not established in evidence to imply consciousness of guilt during rebuttal closing argument. Genus acknowledges that he has forfeited these claims as he failed to raise them in his posttrial motion (*People v. Enoch*, 122 Ill. 2d 176, 186 (1988) (claims of error not raised in a posttrial motion are forfeited)) but urges us to consider these claims for plain error.

¶ 40    The plain error doctrine allows a reviewing court to consider an otherwise forfeited error when "(1) the evidence is close, regardless of the seriousness of the error, or (2) the error is serious, regardless of the closeness of the evidence." *People v. Herron*, 215 Ill. 2d 167, 187 (2005)). Under the first prong, "a reviewing court must evaluate the totality of the evidence and conduct a qualitative, commonsense assessment of it within the context of the case." *People v. Sebby*, 2017 IL 119445, ¶ 53. This determination is not one of the sufficiency of the evidence, but "the closeness of sufficient evidence." *Id*. ¶ 60. To determine if the evidence is closely balanced, "a reviewing court must undertake a commonsense analysis of all the evidence in context." *People v. Belknap*, 2014 IL 117094, ¶ 50. Evidence can be closely balanced when each party presents credible witnesses. *Sebby*, 2017 IL 119445, ¶ 63. Under the second prong, plain-error review is applied when "a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *Id*. The defendant bears the burden of persuasion under both prongs. *Id*. The first step of the plain error analysis is to determine whether an error

occurred. *People v. Eppinger*, 2013 IL 114121, ¶ 19.

¶ 41    Genus argues that that he simply "testified on direct examination that he never sexually abused D.G. or touched her in a sexual manner," and the State improperly responded by asking him about D.G.'s veracity. Genus asserts that the State improperly called upon him to comment directly on the credibility of another witness which amounts to reversible error.

¶ 42    It is generally improper to ask one witness to comment directly on the credibility of another witness. *People v. Becker*, 239 Ill. 2d 215, 236 (2010). However, when this line of questioning is invited by the defendant's theory of the case, cross-examination eliciting the defendant's comments on the veracity of adverse witnesses is not necessarily improper. *People v. Kokoraleis*, 132 Ill. 2d 235, 264 (1989).

¶ 43    Here, Genus denied sexually assaulting D.G. and his theory of the case was that D.G. lied about him sexually assaulting her. He testified on direct examination that Williams threatened to tell the police that he "touched her kid," in response to Genus's threat to cut off William's utilities. Genus also testified on direct examination that, when D.G.'s accusations came to light, he sent Williams a "text message stating that I wasn't going to fall victim to her, to the BS prior to previous statements, and I let her know that [D.G.] was lying." On cross-examination, Genus admitted to sending Williams a Facebook Messenger message wherein he stated, "I didn't touch that fucking liar," referring to D.G. In response to Genus's denial that he had sexually assaulted D.G. at his mother's house, on cross-examination, the State asked, "That was just a big fat lie," to which Genus replied, "[Y]es."  When the State followed up by asking, "[D.G.'s] a liar?", the court sustained an objection.

¶ 44     Genus relies on *People v Shaffer*, 2014 IL App (1st) 113493, and *People v. Stevens*, 2018 IL App (4th) 160138, to support his argument that the State improperly cross-examined him on

the issue of whether D.G. was lying. In *Schaffer*, the defendant was convicted of aggravated criminal sexual assault, home invasion, and armed robbery. The State had alleged that the defendant broke into the victim's friend's condominium, sexually assaulted her, and stole items from the home. The defendant argued that the victim had purchased drugs from him in the past, that he was invited to the home on the date in question, they engaged in consensual sex, the victim paid him for drugs with her watch, and that she fabricated the allegations because she had been caught cheating on her husband. During cross-examination of the defendant, the prosecution repeatedly asked whether the victim lied during her testimony, asking several times if the victim "made that up" and "came up with that" and whether a police detective's testimony concerning his interaction with the defendant where the defendant stated that he should have killed the victim was truthful. *Id*. ¶¶ 36-45. The trial court overruled some objections and sustained others.

¶ 45    On appeal, we held that the prosecution's questions were improper and designed to demean and ridicule the defendant. *Id*. ¶ 51. We found that the questioning forced the defendant to "speculate as to other witnesses' intent and in essence, accuse them of lying." *Id*. The prosecutor did not merely ask the defendant to explain the differences between his and the victim's versions of the events but asked whether the other witnesses had "fabricated their testimony." *Id*. We found plain error occurred where the evidence was closely balanced and hinged on a credibility determination, stating "the prosecution's improper cross-examination denied [the] defendant a fair trial." *Id*. ¶ 58.

¶ 46    In *Stevens*, 2018 IL App (4th) 160138, ¶ 49, the defendant was convicted of two counts of predatory criminal sexual assault of a child. On appeal, he argued that the State improperly elicited testimony from him and a police sergeant about why the victim would lie. On cross

16

examination, the State asked the defendant, "And you have no idea why she would make something like this up" and "So out of the blue your 11[-], now 12-year-old daughter shows up and is making these horrible accusations about you and you have no idea why?" The State conceded error on the issue, and we accepted the concession finding that the State clearly asked the defendant to comment on the veracity of the victim, which is improper. *Id*. ¶ 53 (citing *Shaffer*, 2014 IL App (1st) 113493, ¶ 49). We found that this error was exacerbated in closing arguments, when the prosecutor said, "But he can't come up with any particular reason why she would lie." We found that this comment could be considered harmless error in certain situations, but in this case found "reversal is warranted when the evidence is closely balanced, and the credibility of the witnesses is a crucial factor underlying the jury's determination of guilt or innocence." *Id*. ¶ 53 (quoting *Schaffer*, 2014 IL App (1st) 113493, ¶ 49).

¶ 47   The State distinguishes *Shaffer* and *Stevens* from the facts of this case and urges us to consider *People v. Bakr*, 373 Ill. App. 3d 981 (2007). In *Bakr*, the defendant was convicted of first-degree murder and aggravated battery with a firearm following a gang shooting. At trial, the defendant testified and denied knowing anything about the shooting and stated that the witnesses who testified against him were all lying. The defendant also denied making any inculpatory statements to a detective regarding the shooting.

¶ 48   On appeal, the defendant claimed the prosecution engaged in improper cross examination by asking him to comment on the veracity of other witnesses. *Id*. at 989. We analyzed this argument for plain error, first determining that the evidence was not closely balanced where the evidence included an eyewitness identification, testimony of several of the defendant's co-offenders who named the defendant as the shooter, and the defendant's incriminating statements which included an admission that the defendant shot "in the direction of" the victims." *Id*. at 988-

17

89. We then found that no error occurred because the defendant accused the witnesses who testified against him of lying on direct examination, and therefore he opened the door to such questioning on cross-examination. *Id*. "By raising the issue of the witness' veracity, defendant opened the door for the prosecution to challenge defendant's credibility." *Id.*

¶ 49    We agree with the State that the facts of this case are more similar to *Bakr* than *Schaffer* and *Stevens*. There is no indication in *Schaffer* or *Stevens* that those defendants had previously accused the victim or detectives of lying or otherwise opened the door to challenge their veracity. In this case, Genus accused D.G. of lying shortly after being accused and well before he was arrested in connection with D.G.'s allegations. Defense counsel questioned Genus on direct examination regarding his allegations that D.G. was lying. By doing so, defense counsel opened the door to the State's cross-examination of Genus on this issue. Therefore, we find that no error occurred here, and further plain error analysis is not necessary.

¶ 50    Genus next argues for the first time on appeal that the State "baselessly insinuated during cross-examination that Genus was acting with a consciousness of guilt by hiding the contents of his phone, but then failed to present any evidence to substantiate this accusation." We find no plain error here either.

¶ 51    Genus testified on direct examination that he had a password-protected cell phone. Defense counsel introduced screenshots of a portion of a Facebook message between him and Williams wherein Williams threatened to call "the police and tell them u touched my kid." Defense counsel argued the charges in this case were the result of Williams following through on her threat and stated that "[t]hese charges are motivated by [Williams] making false charges and she threatened to do it before and now it's happening in real-time."

¶ 52    On cross examination, Genus stated that when Williams accused him of "touching her

kid," he denied the allegations in a message but admitted the message did not contain his denial. Genus testified that there was "most likely" more to the conversation and that he did not show his lawyer his phone until the weekend before trial because it was in his family's possession, and no one could get into it because it was password protected. His family had gone through his phone about six months before trial to get the Facebook messages.

¶ 53    We disagree with Genus's contention that the State asked Genus questions presuming facts not in evidence and insinuated that Genus was hiding his phone. Genus admitted into evidence an obviously incomplete conversation between him and Williams, which started mid-sentence. Genus testified to the denial he supposedly made in the message, but that denial was not contained in the admitted portion. He acknowledged there was "most likely" more to the conversation in his phone. The State's cross-examination of Genus on the remainder of the message and Genus's decision to submit only a portion of the message was proper where defense counsel opened the door to this line of questioning. It was likewise proper for the State to inquire about the whereabouts of Genus's phone from the time of his arrest until the time of trial. No error occurred here and therefore plain error analysis is unnecessary.

¶ 54    Genus next argues that he was denied a fair trial when the State argued in rebuttal closing that Genus was hiding from police after D.G. reported the abuse despite there being no evidence presented at trial regarding flight. Again, Genus forfeited this argument by failing to object at trial but urges us to consider this issue for plain error. Again, we find no error occurred.

¶ 55    Prosecutors are afforded wide latitude in closing arguments and may comment on the credibility of the defendant, witnesses, and the defense theory of the case, as well as respond to comments by defense counsel that invite a response. *People v. Jackson*, 2020 IL 124112, ¶ 82. "Closing arguments must be viewed in their entirety and the allegedly erroneous argument must

be viewed contextually." *People v. Blue*, 189 Ill. 2d 99, 128 (2000). "Arguments and statements that are based upon the facts in evidence, or upon reasonable inferences drawn therefrom, are within the scope of closing argument." *People v. Anaya*, 2017 IL App (1st) 150074 ¶ 62. In closing argument, counsel cannot "misstate the evidence or argue facts not in evidence," (*People v. Green*, 2017 IL App (1st) 152513, ¶ 77), but counsel may assert facts that are inferable from the evidence. *People v. Custer*, 2020 IL App (4th) 180128, ¶ 40.

¶ 56    Genus testified at trial that after D.G. made allegations against him, he moved to his mother's home, who lived nearby and was still living with his mother at the time of his arrest in May 2020. He testified that Williams knew where his mother lived and worked but the police never came to question or arrest him.

¶ 57    During closing argument, defense counsel argued that D.G.'s statement that she was afraid of Genus was not believable because Genus lived near D.G. without incident. Defense counsel argued, "this accusation took place August 8th, 2019. [Genus] didn't get arrested until May of 2020. He's living at 18th and Carlove (sic), a mile away. If he wanted to harm somebody, why not go harm them? Why not do something?" In rebuttal, the State noted that Genus claimed he lived nearby with his mother after the allegations against him arose. The State then argued:

> "Let's compare where this goes from there. He's hiding. He says, no, I'm sitting on my mom's front porch a block away. Really? A block away from Scottie Williams, [D.G.]'s grandma, a block away from the school that his own twins go to? Not just Reva's other kids, but his own twins. And grandma didn't call the police. He wasn't there out on the porch. He was hiding.
>
> ***

And [Williams] didn't call the police on you in that year? You're walking up and down the block, a block away from her mother, a block away from her kids' school and she didn't saying. There he is, come pick him up. That's not believable. Unless you're on planet defendant, that's completely absurd. He was not there. And you don't have to believe he was there just because he claims he was there. That's absurd. It's just patently ridiculous."

¶ 58    It is unclear from the record why it took so long for Genus to be arrested in this case. While there was no direct evidence that Genus was actually "hiding" from the police or anyone else after he was made aware of D.G.'s accusations against him, when viewed from the context of both parties' arguments, the State fairly commented on defense counsel's characterization of the evidence, as well as Genus's credibility, and fairly responded in rebuttal to Genus's claim that he continued to live nearby after he was accused of sexually assaulting D.G. *People v. Glasper*, 234 Ill. 2d 173, 204 (2009) ("Statements will not be held improper if they were provoked or invited by the defense counsel's argument.")

¶ 59    Genus testified that he continued to live less than a mile away from the victim after she accused him of sexual assault. Defense counsel used this testimony to support his argument that Genus was not abusive to D.G. and that the fact that he lived nearby yet did not harm D.G. indicates that D.G. was not telling the truth, and therefore was not credible. The State questioned Genus's testimony that he continued to live nearby and attempted to undermine his credibility. The jury heard different versions of events from the witnesses and was called upon to make a credibility determination. In other words, the jury was tasked with determining if any of the witnesses were lying. "The credibility of witnesses is a proper subject for closing argument if it is based on the facts in the record or inferences drawn from those facts." *People v. Flores*, 128

Ill.2d 66, 94 (1989).

¶ 60    Genus's reliance on *People v. Rogers*, 172 Ill. App. 3d 471, 477 (1988), is misplaced. In *Rogers*, the prosecutor personally vouched for the credibility of the officers who testified, and argued evidence that was not presented at trial, including that defendant attempted to hide from police. The prosecutor further argued that if defendant's testimony was believed it would imply that all the State's witnesses were lying when, in fact, defendant's testimony was only inconsistent with four of the seven State's witnesses on one issue. Finally, the prosecutor presented the defendant's prior conviction as substantive evidence that defendant was familiar with the legal system. *Id*. at 476-79. We found that the cumulative effect of counsel's repeated failures to object created a reasonable probability that, but for counsel's failure to object, the result would have been different, and that counsel's failure denied defendant a fair trial. *Id*. at 478-79.

¶ 61    Here, unlike *Rogers*, the State did not vouch for the credibility of the witnesses, did not imply that if Genus were to be believed the State's witnesses must be lying, and has not asserted evidence in argument that was not presented. Furthermore, there was no cumulative error. Accordingly, we find that no error occurred here where Genus's whereabouts prior to the time of his arrest was a proper subject of argument.

¶ 62    We also reject Genus's argument that he received ineffective assistance of counsel. Genus argues that counsel should have objected to the State's improper insinuation that he was hiding the contents of his cell phone and the State's accusations of flight and raised these issues in a posttrial motion.

¶ 63    To determine whether a defendant was denied his or her right to effective assistance of counsel, we must apply the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668

(1984). *People v. Albanese*, 104 Ill.2d 504 (1984). Under *Strickland*, a defendant must prove both that (1) his attorney's performance was deficient; and (2) the deficient performance prejudiced the defendant. *Strickland*, 466 U.S. at 687-94. Under the first prong of the *Strickland* test, a defendant must prove that his counsel's performance fell below an objective standard of reasonableness "under prevailing professional norms." *People v. Colon*, 225 Ill. 2d 125, 135 (2007). Under the second prong, a defendant must show that, "but for" his counsel's deficient performance, there is a reasonable probability that the result of the proceeding would have been different. *Id*. In other words, the defendant must have been prejudiced by his attorney's performance. *Id*. To prevail, a defendant must satisfy both prongs of the *Strickland* test. *Colon*, 225 Ill. 2d at 135. "That is, if an ineffective-assistance claim can be disposed of because the defendant suffered no prejudice, we need not determine whether counsel's performance was deficient." *People v. Graham*, 206 Ill. 2d 465, 476 (2003).

¶ 64 We have already determined that no error occurred with respect to Genus's claims that the State improperly asked him to comment on a witness's veracity and relied on facts not in evidence to imply consciousness of guilt during cross-examination and in rebuttal closing argument. Therefore, Genus could not have suffered prejudice as a result of counsel's failure to object. As such, we find that Genus did not receive ineffective assistance of counsel.

¶ 65 Finally, Genus argues for the first time on appeal that he was improperly subjected to a "double enhancement" of his sentence. Genus acknowledges that he has forfeited this issue by failing to object at trial and failing to raise the issue in a post-sentence motion. *People v. Hillier*, 237 Ill. 2d 539, 544 (2010). The plain error doctrine applies to forfeited sentencing issues, but the defendant must first show that a clear and obvious error occurred at sentencing and that (i) the evidence at sentencing was closely balanced or (ii) the error was so egregious that it denied

the defendant a fair sentencing hearing. *Id*. Genus argues that under the second prong of plain error, "the consideration of an improper aggravating factor denied [him] a fair sentencing hearing." We must first determine whether error occurred. *People v. Williams*, 2022 IL 126918, ¶ 49.

¶ 66    Genus was convicted of two counts of criminal sexual assault, a Class 1 offense, the elements of which were (1) defendant committed an act of sexual penetration upon D.G., who was (2) under the age of 18 at the time, and (3) defendant was a family member. 720 ILCS 5/11-1.20(a)(3) (West 2022). A family member is defined as:

> "a parent, grandparent, child, aunt, uncle, great-aunt, or great-uncle, whether by whole blood, half-blood, or adoption, and includes a step-grandparent, step-parent, or step-child. 'Family member' also means, if the victim is a child under 18 years of age, an accused who has resided in the household with the child continuously for at least 6 months." 720 ILCS 5/11-0.1 (West 2022).

¶ 67    Genus argues that during the sentencing hearing, the trial court cited, as an aggravating factor, that Genus, as D.G.'s stepfather, violated D.G.'s trust. Genus urges that this amounted to an improper double enhancement. During sentencing, the court stated, "[Genus] violated the trust not of just his partner, but of the children." Later the court stated,

> "[Genus] caused irreparable damage to the complaining witness. So in imposing the sentence this Court finds that the sentence, which I will get to in a second, is necessary to protect the public and keep the public and any other children safe from this defendant ***. He put his own interests first and neglected the law. So this Court is not convinced that he can abide by the law, which is also evidence by his criminal history. The sentence is also necessary to deter others. The defendant was in a role of, basically, a parent or a

stepparent to these children and he violated that trust. And so that's why the sentence that the Court is going to impose is also necessary"

¶ 68 The Unified Code of Corrections provides a term of imprisonment for criminal sexual assault (720 ILCS 5/11-1.20(a)(3) (West 2022)), a Class 1 felony of not less than 4 years and not more than 15 years. 730 ILCS 5/5-4.5-30(a) (West 2022). Genus was sentenced to a term of 10 years' imprisonment for the offense of criminal sexual assault. Because Genus's sentence was within the permissible range, we begin with the presumption the sentence was proper. *People v. Knox*, 2014 IL App (1st) 120349, ¶ 46.

¶ 69 Generally, a factor implicit in the offense for which the defendant has been convicted cannot be used as an aggravating factor in sentencing for that offense. *People v. Ferguson*, 132 Ill. 2d 86, 96 (1989). A sentencing court may not consider in aggravation a factor that is inherent in the offense of which the defendant was convicted because the legislature is understood to have incorporated such considerations into the statute. *People v. Saldivar*, 113 Ill. 2d 256, 265-72 (1986) (citing *People v. Conover*, 84 Ill. 2d 400, 404-05 (1981)). However, as we found in *People v. Sauseda*, 2016 IL App (1st) 140134, ¶15,

> "A trial court is not required to refrain from any mention of sentencing factors that constitute elements of the offense. [Citation.] Sentencing hearings do not occur in a vacuum, and the duty to impose a fair sentence entails an explanation of the court's reasoning in the context of the offenses of which a defendant has been convicted. A fair sentence is not just the product of mechanically tallying factors in aggravation and mitigation and calculating the result. Indeed, a sentencing hearing is likely the only opportunity a court has to communicate its views regarding the defendant's conduct, and thus we do not agree that a trial judge's commentary on the nature and circumstances of a

defendant's crimes necessarily results in improperly using elements of the offense as factors in aggravation."

Whether a sentencing court considered an improper factor in aggravation such that remand for resentencing is necessary is reviewed *de novo*. *People v. Robinson,* 172 Ill. 2d 452, 457 (1996).

¶ 70 In *People v. King*, 151 Ill. App. 3d 662 (1987), the defendant pleaded guilty to two charges of criminal sexual assault, which involved the same statutory provisions (sexual penetration of a child by a "family member"). The victims were the defendant's 14-year-old daughter and 15-year-old stepdaughter. King had engaged in sexual intercourse with each of them. *Id*. at 663. King was sentenced to 10 years on each count, to run concurrently.

¶ 71 On appeal, King argued that the trial court abused its discretion by considering his position as the victims' father as an aggravating factor. *Id*. This court rejected this argument, finding:

"In the instant case, the defendant argues that being a family member is an element of his offense. As such, it cannot be used as an aggravating factor. The State contends that there is a difference between merely being a family member and being a father. We agree. A father, by virtue of his position, owes a special duty of protection to his children. The same cannot be said for any person 'who has resided in the household with [the victim] continuously for at least one year.' [Citation.] Accordingly, we find that the trial court did not err in considering the defendant's position as an aggravating factor." *Id*. at 663-64.

¶ 72 Likewise, in *People v. Vistante*, 2023 IL App (4th) 221004-U, the defendant pleaded guilty to criminal sexual assault of his daughter, the same statutory offense at issue here (720 ILCS 5/11-1.20(a)(3) (West 2018)). The defendant argued that the trial court's finding that he held a position of trust regarding the victim because he was the victim's father—an element

inherent to the charged offense—amounted to an improper double enhancement. The defendant also argued that when the court referred to this victim as defendant's daughter, the court considered defendant's status as a family member—an element inherent to the charged offense—which amounted to an improper double enhancement used to bolster the court's finding of serious harm.

¶ 73 We disagreed with the defendant's contention that the trial court's consideration of his position of trust amounted to a double enhancement. "Simply because a person is a family member does not necessarily entail that person holds a position of trust. Moreover, a position of trust is not an underlying element of criminal sexual assault." *Id*. ¶ 24. We noted that we had previously found that "[i]t is appropriate for a trial court to consider whether a defendant convicted of criminal sexual assault holds a position of trust or supervision in relationship to the child/victim." *Id*. (citing *People v. Madura*, 257 Ill. App. 3d 735, 739 (1994)).

¶ 74 Like *King* and *Vistante*, we find that the trial court's consideration of Genus's position of trust was proper. Although Genus lived with Williams and her children, being a live-in boyfriend does not necessarily mean that Genus held a position of trust in the household. Moreover, a position of trust is not an underlying element of criminal sexual assault. Besides, "[i]t is appropriate for a trial court to consider whether a defendant convicted of criminal sexual assault holds a position of trust or supervision in relationship to the child/victim." *Madura*, 257 Ill. App. 3d 735, 739 (1994). We therefore find that no error occurred here.

¶ 75                                     III. CONCLUSION

¶ 59 Considering the foregoing, we reverse Genus's conviction on count II and vacate the 15-year sentence imposed on that count. We affirm the remainder of the judgment of the trial court.

¶ 60 Affirmed in part; reversed in part.

27